## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

ROGER D. MAGEE

**Versus**

WALTER P. REED, IN HIS
OFFICIAL CAPACITY AS DISTRICT
ATTORNEY FOR WASHINGTON
PARISH AND IN HIS PERSONAL
CAPACITY, RANDY "COUNTRY"
SEAL, IN HIS OFFICIAL CAPACITY
AS SHERIFF OF WASHINGTON
PARISH AND IN HIS PERSONAL
CAPACITY, JERRY WAYNE COX,
MIKE HALEY, JIM MILLER,
CORBET HUNT, DARREN SPEARS,
MICHELLE BRUMFIELD,
MITCHEM NESMITH, DAMEN
MITCHELL, AND DOE
DEFENDANTS

CIVIL ACTION NO.:  14-1986

JUDGE:  IVAN L.R. LEMELLE

MAGISTRATE:  SALLY SHUSHAN

**JURY DEMANDED**

## FIRST AMENDED COMPLAINT FOR DAMAGES, DECLARATORY RELIEF, AND
## INJUNCTIVE RELIEF

NOW INTO COURT, through undersigned counsel, comes Roger D. Magee (hereinafter "Plaintiff" or "Magee"), and for his Complaint, alleges as follows:

### THE PARTIES

1.

The defendants herein are:

a.     Walter P. Reed (hereinafter sometimes "Reed") is a person of the full age of majority, serving, at all material times, as the Washington Parish District Attorney for the 22nd Judicial District.  Plaintiff alleges that Defendant Reed is, and at all relevant times was, a policy-making official of Washington Parish, acting under the color of law and within his capacity as an employee, agent, representative, and servant of Washington Parish.  Defendant Reed is, and at all material times was, the individual charged with the duty and granted the authority to render final decisions regarding every criminal prosecution instituted or pending in Washington Parish, including without limitation who is prosecuted, when, and how one is prosecuted.  On information and belief, District Attorney Reed directly participated in the decisions involving the arrest, imprisonment (and continued confinement without bail), and prosecution of Plaintiff Magee, as more fully set forth below.  Defendant Reed is sued herein in both his official and individual capacities.

b.     Randy "Country" Seal (hereinafter sometimes "Seal"), a person of the full age of majority and the duly appointed as Sheriff for the Washington Parish Sheriff's Office, who resides in the Eastern District of Louisiana, is sued in both his official and individual capacities.  Plaintiff is informed and believes and thereon alleges that Defendant Seal is, and at all relevant times was, a policy-making official of the Washington Parish Sheriff's Office.  Defendant Seal is, and at all material times was, the individual charged with the duty and granted the authority to render final decisions regarding policies and practices of the Washington Parish Sheriff's Office, including without limitation policies and procedures regarding the arrest of criminal suspects and use of force, as well as policies and procedures regarding the Washington Parish Jail, including without limitation policies and procedures concerning conditions of confinement and medical care for inmates.

c.     Jerry Wayne Cox (hereinafter sometimes "Jerry Wayne") is a person of the full age of majority and resides in the Eastern District of Louisiana.

d.      Mike Haley (hereinafter sometimes "Haley"), a person of the full age of majority and the duly appointed as Chief Deputy for the Washington Parish Sheriff's Office, who resides in the Eastern District of Louisiana, is sued in both his individual and official capacities.  Plaintiff is informed and believes and thereon alleges that Defendant Haley is, and at all relevant times was, a policy-making official of the Washington Parish Sheriff's Office.  Defendant Haley is, and at all material times was, a policy-making official for the Washington Parish Sheriff's Office who, on information and belief, either directly participated in the decisions involving the arrest of Plaintiff Magee, as more fully set forth below, and/or ratified the actions of co-defendants, as more fully set forth herein.

e.      Jim Miller (hereinafter sometimes "Miller") is a person of the full age of majority, employed by the Washington Parish Sheriff's Office and holds the title of "Warden" of the Washington Parish Jail, who resides in the Eastern District of Louisiana, is sued in both his individual and official capacities.  Plaintiff is informed and believes and thereon alleges that Defendant Haley is, and at all material times was, a policy-making official for the Washington Parish Sheriff's Office who, on information and belief, either directly participated in the decisions involving the arrest of Plaintiff Magee, as more fully set forth below, and/or ratified the actions of co-defendants, as more fully set forth herein.

f.      Corbet Hunt (hereinafter sometimes "Hunt") is a person of the full age of majority, employed by the Washington Parish Sheriff's Office holding the rank and title of "Deputy" and who on information and belief resides in Washington Parish and within the Eastern District of Louisiana. Plaintiff alleges that Defendant Hunt is, and at all relevant times was, acting under the color of law and within his capacity as an employee, agent, representative, and servant of Defendant/Sheriff Randy "Country" Seal.  Defendant Hunt is sued herein in his individual capacity.

g.     Darren Spears (hereinafter sometimes "Spears") is a person of the full age of majority, employed by the Washington Parish Sheriff's Office holding the rank and title of "Deputy" and who, on information and belief, resides in Washington Parish and within the Eastern District of Louisiana.  Plaintiff alleges that Defendant Spears is, at all relevant times was, acting under the color of law and within his capacity as an employee, agent, representative, and servant of Defendant/Sheriff Randy "Country" Seal.  Defendant Spears is sued herein in his individual capacity.

h.     Michelle Brumfield (hereinafter sometimes "Brumfield") is a person of the full age of majority, employed by the Washington Parish Sheriff's Office holding the rank and title of "Deputy" and who, on information and belief, resides in Washington Parish and within the Eastern District of Louisiana.  Plaintiff alleges that Defendant Brumfield is, at all relevant times was, acting under the color of law and within his capacity as an employee, agent, representative, and servant of Defendant/Sheriff Randy "Country" Seal.  Defendant Brumfield is sued herein in his individual capacity.

i.     Mitchem Nesmith (hereinafter sometimes "Nesmith") is a person of the full age of majority, employed by the Washington Parish Sheriff's Office holding the rank and title of "Deputy" and who, on information and belief, resides in Washington Parish and within the Eastern District of Louisiana.  Plaintiff alleges that Defendant Nesmith is, at all relevant times was, acting under the color of law and within his capacity as an employee, agent, representative, and servant of Defendant/Sheriff Randy "Country" Seal.  Defendant Nesmith is sued herein in his individual capacity.

j.      Damen Mitchell (hereinafter sometimes "Mitchell") is a person of the full age of majority, employed by the Washington Parish Sheriff's Office holding the rank and title of "Deputy" and who on information and belief resides in Washington Parish and within the Eastern District of Louisiana. Plaintiff alleges that Defendant Mitchell is, at all relevant times was, acting under the color of law and within his capacity as an employee, agent, representative, and servant of Defendant/Sheriff Randy "Country" Seal. Defendant Mitchell is sued herein in his individual capacity.

k.      John Does 1 and 2 are persons of the full age of majority, who on information and belief reside in the Eastern District of Louisiana, and whose proper names Plaintiff has been unable to ascertain. Plaintiff is informed and believes and thereon alleges that John Does 1 & 2 are and were policy-making officials with respect to policies and practices involving the facts herein, including without limitation the protocol used herein in the apprehension and arrest of criminal suspects. John Does 1 and 2 are sued herein in both their official and individual capacities.

l.      Doe Insurance Companies 3 through 5 are, on information and belief, doing business within the Eastern District of Louisiana and whose names Plaintiff has been unable to ascertain.

### PRIVATE PARTIES AS STATE ACTORS

Plaintiff alleges that the private party hereinabove, Defendant Jerry Wayne Cox is, and at all material times was, a "state actor" within the meaning of 42 U.S.C. § 1983, because Jerry Wayne participated in joint activity with state actors, as more fully set forth below.

### JURISDICTION AND VENUE

2.

This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343, and 42 U.S.C. § 1983. Declaratory relief is authorized by 28 U.S.C. §§ 2201 and 2202. This court has jurisdiction over the state law claims pursuant to Pendent Jurisdiction.

3.

Venue is proper in this district and division under 28 U.S.C.A. § 1391(b), because the underlying acts and conduct violating applicable laws and constitutional rights occurred in this district; and/or each defendant conducts its/his/her affairs in, or is an inhabitant of, resides in, or has an agent in this district.

## FACTUAL ALLEGATIONS

### *First Amendment/Free Speech Retaliation*

4 (a).

Plaintiff alleges that, commencing on or about 2010 through April/May 2012, he provided information to the Federal Bureau of Investigation ("FBI"), concerning Jerry Wayne Cox ("Jerry Wayne"). This information included actions taken by Jerry Wayne with respect to property damage insurance claims made by Jerry Wayne. In addition, Plaintiff advised the FBI about Jerry Wayne's relationship with his good friend, Defendant Walter Reed ("Reed"). Jerry Wayne is a Pentecostal Preacher and Minister of the Faith Tabernacle Church, located in Franklinton, Louisiana. Among other things, Plaintiff spoke to the FBI about personal injury referrals that had been made by Jerry Wayne to Reed, settlements of those matters, issues about how those cases were settled, and questions about how and to whom settlement proceeds were distributed.

4 (b).

Plaintiff is informed, believes, and thereon alleges that Reed was a regular attendee at Jerry Wayne's camp meetings and had, at all material times, a business relationship with Jerry Wayne. One of those businesses, Plaintiff alleges, was the personal injury "business."  Plaintiff is informed that Jerry Wayne would refer clients to Reed, while Reed, in turn, would bring in counsel (such as the McCranie, Sistrunk et al. law firm) to file pleadings, etc.  Despite the use of litigation counsel, Plaintiff is informed, Reed and Cox acted, at least in one instance, as the primary decision makers over the personal injury suit and, Plaintiff is informed, believes, and alleges, shared in settlement proceeds.  However, Plaintiff is informed, despite the involvement of Reed and Cox, there was no written agreement from the personal injury client approving such involvement, as ethically required, nor was there documentation confirming what amounts went to Reed/Cox out of settlement proceeds.  Plaintiff is further informed, believes, and alleges that the personal injury "joint venture" between Reed and Jerry Wayne helped feed expensive lifestyles led by both men.  In particular, Jerry Wayne built a lavish and enormous "chateau" (20,000 sq. ft.), filled with marble and crystal fixtures and adorned with approximately forty-eight exterior lights.  Despite large amounts of income that Reed <u>reported</u> to the IRS and as set forth in the Felony Criminal Indictment ("Indictment") filed by the U.S. Department of Justice against Walter Reed, Reed's total income was, allegedly, "in excess" of his reported income of $714,060 for Tax Year 2012.  *See* Indictment, Count 13.

4 (c).

Plaintiff is informed, believes, and alleges that at least one reason for Reed's and Cox's concern about Plaintiff's speaking with the FBI was the fact that it might lead to facts concerning underreporting of income and tax fraud, made possible, in part, by the lack of documentation of Reed's and Cox's share of settlement proceeds.

5 (a).

During the first weekend in August 2012 (on or about August 4 through August 6), Jerry Wayne made a trip to Arkansas in order to attend the "Converge At The Rock"Arkansas Campmeeting. This meeting was hosted by Pentecostal Preacher Joel Holmes at his First Pentecostal Church, in North Little Rock, Arkansas. In addition to Jerry Wayne, his son, Aaron, and daughter, Debbie, and other family members also attended. A further guest and attendee at the 2012 Campmeeting was Walter Reed. Plaintiff attaches hereto a photograph of Walter Reed, flanked by Preachers Joel Holmes and Jerry Wayne Cox, as Exhibit "A." Plaintiff is informed that the photograph was taken in the First Pentecostal Church Rotunda. In the photograph, Reed is seen holding an issue of "Together" magazine, a publication by the Worldwide Pentecostal Fellowship. Plaintiff is informed and believes that Reed and Cox had a primary objective for traveling to North Little Rock, *viz.*, Reed was there to host a large, prestigious minister's dinner that would promote Cox's and Reed's personal injury "partnership." Plaintiff is informed that Holmes' First Pentecostal Church consists of approximately $1,500 members – a large number of potential clients for Reed and Cox. Plaintiff alleges that Reed and Cox, while in Arkansas, were also interested in taking the opportunity to send the serious message to Plaintiff that he should stop his flow of information about their business dealings to the FBI. Upon arriving in Arkansas, Jerry Wayne asked, through his son (Aaron), to meet with Plaintiff. The meeting between Plaintiff and Jerry Wayne took place at Joel Holmes' Church. During the meeting, Jerry Wayne said to Plaintiff something to the effect of, "You didn't scare us [Walter Reed and Jerry Wayne] much with the FBI; well, you scared us a little." Jerry Wayne added, "but when I found out that Reed was ex-FBI, Reed said that he took care of it." Specifically, Wayne cautioned Plaintiff: "If and when you cross state lines [into Louisiana], Reed will handle you!"

5 (b).

Plaintiff is informed, believes, and alleges that Cox had knowledge of Plaintiff's contact with the FBI, through at least one source, Plaintiff's brother. Plaintiff is further informed, believes, and alleges that Cox, in turn, advised his business partner, Reed, that Plaintiff was providing information to the FBI. Further, because Reed was with Cox at the August 2012 Campmeeting in North Little Rock, Plaintiff alleges that Reed was fully aware of, had approved, and was involved with the threat made by Cox to Plaintiff at the First Pentecostal Church.

5 (c).

Plaintiff alleges that the U.S. Government's Indictment against Reed references a payment made to Holmes' First Pentecostal Church out of Reed's Campaign Fund, consistent with Plaintiff's allegations hereinabove. *See* Indictment, Count 6.

5 (d).

On or about October 25, 2012, and within a period of approximately two (2) months after the threat made by Cox to Plaintiff, an Order For Body Attachment was filed in the matter entitled Crystal Magee vs. Roger D. Magee (Circuit Court of Faulkner County Arkansas, Fourth Division), No. DR 2010-1066. The Order For Body Attachment concerned a claim by the ex-wife of Plaintiff for unpaid child support. During 2012, Plaintiff alleges that he had suffered illnesses. As a result, Plaintiff had not worked and had been unable to make certain child support payments. By virtue of the Uniform Interstate Family Support Act (UIFSA), Plaintiff alleges that the Circuit Court of Faulkner County, Arkansas, properly exercised jurisdiction over Plaintiff's child support obligations, and Plaintiff had been making support payments to the Office of Child Support Enforcement in Conway, Arkansas. In turn, Plaintiff alleges, his support payments were sent from the Office of Child Support Enforcement in Arkansas to Louisiana.

5 (e).

After issuance of the above Order For Body Attachment, Plaintiff advised of his illnesses. Eventually, an oral motion was made by the Office of Child Support Enforcement in Conway, on Plaintiff's behalf, resulting in a _recall_ of the October 25, 2012, Attachment Order, based on Plaintiff's filing for Social Security Disability benefits. An Order To Recall Body Attachment was signed by the Circuit Court of Faulkner County on or about July 12, 2013. Plaintiff is informed, believes, and alleges that Cox, Reed, and Sheriff Seal had knowledge of the above Order To Recall Body Attachment ("Recall Order"), particularly in light of Seal's involvement and partnership with the District Attorney's Office in a "roundup" of parents who were in arrears on their child support payments during 2013.

5 (f).

Plaintiff is informed, believes, and alleges that the issuance of the above Order for Body Attachment was neither coincidental nor was it instigated by Plaintiff's ex-wife, Crystal Magee, but, rather, it was engineered by Reed, through the channels of the District Attorney's Office, and by Cox. During the period of nonpayment of child support in 2012, Crystal Magee never contacted Plaintiff requesting payment. On the other hand, Plaintiff alleges, Cox had already threatened Plaintiff, and Reed and Cox were the ones interested in the apprehension of and court action taken against Plaintiff, as more fully set forth herein.

5 (g).

Plaintiff alleges that, during 2013, Chrystal Magee had no contact with him and no requests for child support were ever made by her. This continued through the early part of 2014. In March 2014, Plaintiff considered traveling to Louisiana to visit his family. Concerned, however, about Cox's threat about what Reed might do, should Plaintiff cross into Louisiana, Plaintiff visited the Office of Child Support Enforcement in Conway, Arkansas. This was on or about March 27, 2014. During his visit, Plaintiff was assured that he was protected by the Recall Order. Out of an abundance of caution, the Office of Child Support Enforcement suggested that Plaintiff bring the Recall Order with him, just in case any issues might arise. Plaintiff took that advice.

6.

On Friday, March 28, 2014, Plaintiff traveled from Arkansas to Louisiana for a visit with his family, including his 16 month-old grandson. Plaintiff was accompanied by his wife and his 9 year-old daughter. Plaintiff's first stop was at a nursery in Folsom, Louisiana. Afterwards, Plaintiff drove to his aunt's home, located off of Hwy 430 in Franklinton. Plaintiff arrived at his aunt's home at approximately 2:30 p.m. in the afternoon. Plaintiff was met by his aunt and two of Plaintiff's children (ages 22 and 17), as well as Plaintiff's grandson. In addition to the above, there were five (5) adults, related to Plaintiff, and two (2) small children (approximately 2 and 4 years old), visiting Plaintiff's aunt. The above family members and children were located on the back patio visiting with one another. Plaintiff was seated, holding his 16 month-old grandson in his lap, while the other small children were playing at Plaintiff's feet.

*Excessive Force*

7.

Within minutes of Plaintiff's arrival at the residence, at approximately 3:00 p.m., Plaintiff alleges that at least five (5) units converged upon the residence.  Officers quickly exited their vehicles and went into a bunched formation that moved rapidly toward the house.  As the officers descended upon the house and rear patio, the officers were in a crouched position and, Plaintiff is informed, believes, and alleges, some or all of the officers had their weapons drawn (out of their holsters or "leather").  Moreover, Plaintiff is informed and believes, the officers' weapons were pointed in the direction of the house/back patio, rather than in the down position.  Some or all of the officers wore body armor. Visibility was clear.  It was broad daylight.  Plaintiff gently removed his grandchild from his lap and set him on the ground.

8.

The lead officer (of the formation) came within a distance of approximately 25/30 feet and motioned with his finger to Plaintiff.  The other officers' weapons were out of their leathers and were pointed at Plaintiff.  No verbal commands were given.  Plaintiff responded by standing up. Plaintiff, addressing the lead officer, stated that, if this had to do with child support payments, he was "in compliance" with the State of Arkansas and that he could show them court papers that relieved Plaintiff of his obligations due to his disabilities.

9.

Plaintiff proceeded toward the open double doors that led to the dining room, in order to retrieve the Arkansas court papers, *viz.,* the Recall Order, located on the dining room table. Plaintiff had brought this with him on the trip from Arkansas, reminded of the threat that Jerry Wayne had made to him about Plaintiff's return to Louisiana. However, soon after Plaintiff went through the double doorway, he was rushed by the officers and was tased in his back. Plaintiff crashed head first onto the concrete floor. Plaintiff next recalls approximately three or four officers coming down on his back. Plaintiff was handcuffed. After being handcuffed, Plaintiff was tased again. During this assault by the officers, the children were terrified, believing that Plaintiff had been shot. The adults told the officers that their use of force was totally unjustified, as they attempted to record the officers and the aftermath of Plaintiff's arrest with their cell phones. Family members were told to get out of the way.

10.

As a result of the above, Plaintiff alleges that, among other things, he was unconscious for a period of time and suffered severe traumatic brain injury. After the above incident and while incarcerated, Plaintiff experienced a number of symptoms, including without limitation profound headaches, disorientation, dizziness, fatigue, and heat in his head, as more fully set forth herein. Further, Plaintiff injured his left foot, left knee, and shoulder in the above incident. At the time of the filing of this Complaint, Plaintiff does not know the full extent of his brain injury. However, Plaintiff alleges, his symptoms have worsened and Plaintiff is experiencing some memory loss. Plaintiff is undergoing testing, including a Brain MRI, and treatment with a Neurologist. Plaintiff reserves the right to supplement/amend this Complaint regarding his diagnosis, treatment, and prognosis.

11.

Plaintiff alleges that the officers involved in the above arrest were Deputies employed by the Washington Parish Sheriff's Office.  Plaintiff is informed and believes and thereon alleges that the arresting officers include without limitation Defendants Corbet Hunt, Darren Spears, Michelle Brumfield, Mitchem Nesmith, and Damen Mitchell.  Plaintiff is informed and believes that there were more officers involved; however, Plaintiff does not know their identities at this time.

12.

After a period of time, Plaintiff was able to stand up and, then, started to vomit.  Plaintiff and his family members requested an ambulance.  The family informed the officers that Plaintiff was diabetic and required insulin daily.

13.

No ambulance was called.  Instead, Plaintiff was shoved into the rear of a patrol car where Plaintiff drifted in and out of consciousness as he was transported to the Washington Parish Jail in Franklinton, Louisiana.

14.

Upon arrival at the Washington Parish Jail, Plaintiff was taken into a room where Plaintiff was confronted with approximately five (5) Washington Parish Deputies, including defendants herein.  One of the Deputies bragged, "In case you ever want to come looking for me, I'm the one who tased you, you son-of-a-bitch!"  Plaintiff was forced to remain in the room for approximately ½ hour, before he was booked.

***Press Release from Washington Parish Sheriff's Office***

15.

Plaintiff is informed and believes that, after his arrest, either the Washington Parish District Attorney, Defendant Reed, and/or the Sheriff of Washington Parish, Defendant Seal, issued a Press Release concerning Plaintiff.  In a local newspaper, "The Daily News," an article was published on April 1, 2014, entitled:  "Man Owing Thousands In Back Child Support Arrested."  On its front page, the newspaper referred to a "Dead Beat Dad" and showed Plaintiff's mug shot.   The Press Release, published by "The Daily News," stated the following about Plaintiff's arrest:  "When deputies approached and advised him [Plaintiff] he was under arrest, he became angry and hostile and declared that he was not going to jail.  Detective Corbet Hunt asked Magee to walk with the deputies to another area so that they could discuss the situation outside the presence of the others who were being very vocal and disruptive.  Magee pulled away from Hunt and began walking to the rear door of the residence.  He was given verbal orders to stop, but refused to comply.  He continued to walk away from the officers who feared that might have access to weapons if he went inside."

16.

Plaintiff alleges that the above account is false.  Specifically, Plaintiff alleges that he was never given any verbal commands, was not told of the intent to arrest, nor did Plaintiff "pull away" from any officer before he was tased and knocked down to the concrete floor.

***Plaintiff's Incarceration:  Conditions of Confinement/False Imprisonment***

17.

After Plaintiff was booked, he was incarcerated at the Washington Parish Jail (hereinafter sometimes "Jail").  Plaintiff was assigned to Block A and, then, assigned to Block D.  There was little ventilation in Block D.  The walls and ceilings were covered with black mold.  The men assigned to Block D far outnumbered the number of beds (approximately 26 beds); accordingly, Plaintiff and other inmates were forced to sleep on the floor.

18.

Plaintiff is informed and believes and thereon alleges that it is a policy of the Washington Parish Jail to overcrowd the jail. Plaintiff alleges that this policy increases the money that is received by Sheriff Seal, which, Plaintiff is informed and believes, is a daily rate paid by the State of Louisiana according to the number of Department of Correction inmates housed at the Jail. Plaintiff alleges that the overcrowding at the Jail is not reasonably related to a legitimate goal.

19.

Despite Plaintiff's injuries to his head, foot, knee, and shoulder, Plaintiff alleges that he was denied medical care. In view of the fact that Plaintiff's head had hit a concrete floor and in light of his complaints thereafter, including severe headaches, dizziness, disorientation, and fatigue, Plaintiff alleges that he should have been taken to an emergency room immediately for evaluation. Plaintiff alleges that he should have received proper diagnostic testing, including without limitation a Brain MRI, and should have been referred, immediately, to a Neurologist. None of this was done. Instead, despite repeated complaints from Plaintiff about his head and brain and requests from Plaintiff's family for medical treatment, Plaintiff did not receive a CT Scan for 1 and ½ months. When Plaintiff advised the Jail nurse of his head pain and other symptoms, her repeated response was: "There's nothing wrong with you!" No treatment, whatsoever, was offered for Plaintiff's foot, which he limped on, and Plaintiff received no treatment for his knee and shoulder. Further, Plaintiff suffered from chronic illnesses that were made known to the Jail. These included, among other things, diabetes and hypertension. Although it was made clear that Plaintiff required daily insulin injections, he was denied insulin for three (3)/four (4) days at a time. With respect to his blood pressure, Plaintiff did not receive his medication for approximately one (1) week at a time.

20.

Plaintiff alleges that Defendants Seal and Warden Miller operated a facility that was and is understaffed, fails to treat inmates for their illnesses, including chronic illnesses, fails to monitor and dispense medication to inmates, fails to maintain honest, accurate records regarding medications, and lacks protocols for collecting, processing, distributing, logging, and triaging medical requests. Plaintiff is informed and believes and thereon alleges that the Washington Parish Jail was and is so understaffed that officers are taken off the streets, with no training, in an attempt to staff the facility. Further, Plaintiff alleges, one of the policies of the Washington Parish Jail (either explicit or *de facto*) is to ignore detainee's complaints about the lack of medical care or about jail conditions by, simply, disregarding the Administrative Remedy Procedure ("ARP") Complaints submitted by detainees.  Knowing that the courts require inmates to exhaust administrative remedies and to file ARPs and any appeals before filing suit, Plaintiff alleges that the Washington Parish Jail, systematically, fails to respond to the ARPs and deposits them in the "round file", as more fully set forth below.

### *Plaintiff followed Administrative Remedy Procedures/No Response*

21.

Plaintiff alleges that he complained, repeatedly, about his lack of medical care and lack of treatment for his chronic illnesses, and that he completed and submitted, at least, four (4) Written Complaints, consistent with the Administrative Remedy Procedures ("ARP").  Plaintiff never received a written response to any of his ARP Form Complaints.  However, Plaintiff alleges, Defendant Warden Miller taunted Plaintiff, calling Plaintiff a "sorry son-of-a-bitch!"

22.

During his incarceration, lasting ninety-seven (97) days, Plaintiff made a number of requests for bail through his family and criminal defense counsel. Plaintiff's requests were refused. The reason given by Defendant Reed was that there was a "DA Hold." Plaintiff alleges that, while there is a hold known as a "Parole Hold" (disallowing bail), there is no such thing as a "DA Hold." Plaintiff alleges that the "DA Hold" constituted false imprisonment by both Defendants Reed and Seal and further constituted free-speech retaliation on the part of Reed for Plaintiff's speaking to the FBI, as more fully set forth herein.

23.

Eventually, on July 7, 2014 (101 days after his arrest), Plaintiff was released from the Washington Parish Jail. The condition for Plaintiff's release, however, was that Plaintiff must plead to a violation under LSA-R.S. 14:75 (Failure to Pay Child Support) and LSA-R.S. 14:108 (Resisting An Officer). In exchange for his plea and agreement to pay restitution, Plaintiff was given probation for a period of five (5) years. Plaintiff has, since, filed a notice of appeal.

24.

Approximately one (1) day after his release, Plaintiff received a telephone call from the daughter of Jerry Wayne Cox, Debbie Cox. In that conversation, Ms. Cox told Plaintiff that Jerry Wayne "loved" Plaintiff and that Plaintiff was out because Jerry Wayne had spoken to Walter Reed. Debbie Cox, then, asked Plaintiff whether he intended to "pursue this any further?" Plaintiff took this to be a question about whether Plaintiff intended to continue to cooperate with the FBI and its investigation. Plaintiff advised Debbie Cox that he was "done."

**COUNT I – VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. § 1983**

**(Fourth and Fourteenth Amendments – False Arrest/Excessive Force Against All**

**Defendants (Except Warden Jim Miller), Including Walter Reed In Both His Capacity As**

**District Attorney And In His Individual Capacity)**

25.

Plaintiff repeats, re-alleges, and incorporates by reference all of the preceding allegations of this Complaint.

26.

Plaintiff alleges that he possessed the right, guaranteed by the Fourth and Fourteenth Amendments of the United States Constitution, to be free from unreasonable seizures, false arrests, and excessive force.  Plaintiff further alleges that Defendants herein had knowledge of the above rights under the Constitution.

27 (a).

Plaintiff alleges that there was no probable cause to arrest him and no factual and/or legal justification for his arrest.  Plaintiff alleges that the Deputies involved in Plaintiff's arrest, and each of them, lacked sufficient knowledge that would warrant a prudent person's belief that Plaintiff had committed a crime: Plaintiff advised the Deputies that he was in possession of court papers from the State of Arkansas (Plaintiff's domicile) that excused Plaintiff's obligation for child support due to Plaintiff's disabilities.  With young children at Plaintiff's feet and family members present, Plaintiff informed the officers that he intended to get the documents (inside the house and on a table) and produce them.  The officers, with guns drawn, aimed, and ready to fire, chose not to allow Plaintiff to obtain the documents and, instead, assaulted Plaintiff as if Plaintiff were an armed-and-dangerous criminal or some sort of terrorist.  LSA-R.S. 14:75 (F) provides, in pertinent part, that: "It shall be an affirmative defense . . . that the obligor was financially unable to pay the support obligation during and after the period that he failed to pay as ordered by the court."  Plaintiff was informing the officers that there was a defense to the charge and, further, that he possessed court documents excusing his obligation.

27 (b).

Plaintiff is informed, believes, and alleges that Defendants Reed, Seal, and Cox, prior to Plaintiff's arrest, had knowledge of the jurisdiction over Plaintiff's child support obligation by the State of Arkansas and knowledge of the Recall Order.  Despite the fact that Arkansas – not Louisiana – had jurisdiction over child support enforcement, consistent with the Uniform Interstate Family Support Act (UIFSA), Plaintiff is informed, believes, and alleges that Reed provided legal advice to Seal that the Washington Parish Sheriff's Office did have probable cause to arrest Plaintiff and had the power to arrest Plaintiff, despite the Arkansas Recall Order.

27 (c).

Plaintiff is further informed, believes, and alleges that Defendants Reed and Cox communicated to Seal instructions that the arrest of Plaintiff should involve i) a large deployment of officers and showing of force; and ii) the use of force against Plaintiff.

27 (d).

Plaintiff alleges that the lack of jurisdiction by Louisiana and probable cause for arrest, when Plaintiff was arrested on March 28, 2014, is evidenced by a later transmission by the Louisiana Department Of Children & Family Services ("DCFS"), Covington Division, requesting that Arkansas close the enforcement case.  Plaintiff is informed that this request occurred on or about April 2, 2014.  Plaintiff is informed, believes, and thereon alleges that DCFS did not act on its own accord.  Rather, Plaintiff is informed, believes, and alleges that the DCFS was requested by Reed and Seal to close the Arkansas case, in attempt to justify Plaintiff's arrest and confinement, as more fully set forth herein.  However, Plaintiff alleges, the request to close the Arkansas case is an acknowledgement that Arkansas, on March 28th, had proper jurisdiction.

28.

In addition to the lack of probable cause to arrest, there was no threat to the officers and no reason for the extreme showing and use of force used on Plaintiff.  Plaintiff alleges that the officers' conduct was either willful or done with deliberate indifference to Plaintiff's rights; therefore, such conduct was not objectively reasonable, as more fully set forth below.

29.

As a direct and proximate result of defendants' conduct as alleged above, Plaintiff has suffered and continues to suffer physical injuries and special and general damages.

30.

Plaintiff is entitled to attorney's fees pursuant to 42 U.S.C. § 1988.

31.

Plaintiff is further informed and believes and thereon alleges that the above-described acts of defendants depriving Plaintiff of his constitutionally protected rights, privileges and immunities were done with evil motive or intent, or with reckless or callous indifference to Plaintiff's rights. Accordingly, Plaintiff seeks an award of punitive damages against the individual defendants in an amount according to proof.

## COUNT II – VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. § 1983

## (Fourth, Fifth, and Fourteenth Amendments – Procedural Due Process Violations/False Imprisonment Against Defendants Seal And Reed, In Both Their Official Capacities And Individual Capacities)

32.

Plaintiff repeats, re-alleges, and incorporates by reference all of the preceding allegations of this Complaint.

33.

Plaintiff alleges that he possessed the right, guaranteed by the Fourth, Fifth, and Fourteenth Amendments of the United States Constitution, to be free from unreasonable searches and seizures, that no Warrants shall be issued without probable cause, and that he not be deprived of life, liberty, or property without due process of law.  Plaintiff alleges that Defendants Reed and Seal, among others, had knowledge of the above rights under the Constitution.

34 (a).

Plaintiff alleges that Defendants Reed and Seal, among others, violated Plaintiff's rights when he was not allowed to post Bail and was kept in the Washington Parish Jail. Plaintiff alleges that there is no such thing as a "DA Hold" and that his continued incarceration for 101 days constituted a false imprisonment. Plaintiff alleges that the so-called "DA Hold" imposed by Reed violated the Louisiana Constitution of 1974, § 18 (Right to Bail). Section 18 (A) provides, in pertinent part, as follows: "Before and during trial, a person shall be bailable by sufficient surety, except when he is charged with a capital offense and the proof is evident and the presumption of guilt is great." Section 18 (B) further provides, in pertinent part, as follows: "However, a person charged with a crime of violence as defined by law or with production, manufacture, distribution, or dispensing or possession with intent to produce, manufacture, distribute, or dispense a controlled substance . . . and the proof is evident and the presumption of guilt is great, shall not be bailable if, after a contradictory hearing, the judge or magistrate finds by clear and convincing evidence that there is a substantial risk that the person may flee or poses an imminent danger to any other person or the community."

34 (b).

Plaintiff alleges that neither Sections 18 (A) nor (B) applied to Plaintiff's case (an alleged failure to pay child support). Reed's "DA Hold" was a violation of the Louisiana Constitution and a violation of Plaintiff's rights under the United States Constitution.

35.

Defendants Reed and Seal, without just and legal cause, violated Plaintiff's clearly established rights under the laws and Constitution of the United States.

36.

As a direct and proximate result of the aforementioned acts, Plaintiff has suffered and continues to suffer general, special, and economic damages, including without limitation physical injuries, pain and suffering, mental anguish, and loss of enjoyment of life in an amount according to proof.

37.

Plaintiff is further informed and believes and thereon alleges that the above-described acts of defendants depriving Plaintiff of his constitutionally protected rights, privileges and immunities were done with evil motive or intent, or with reckless or callous indifference to Plaintiff's rights. Accordingly, Plaintiff seeks an award of punitive damages against the individual defendants in an amount according to proof.

**COUNT III – VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. § 1983**

**(First Amendment – Free Speech Retaliation Against Defendant Jerry Wayne Cox And Defendants Reed And Seal, In Both Their Official And Individual Capacities)**

38.

Plaintiff repeats, re-alleges, and incorporates by reference all of the preceding allegations of this Complaint.

39.

Plaintiff alleges that he possessed the right, guaranteed by the First Amendment of the United States Constitution, to be free from retaliation for the exercise of free speech.

40.

Plaintiff alleges that (1) he was engaged in constitutionally protected activity. In speaking, critically, about public officials, *viz.,* District Attorney Walter Reed, and, in particular, by providing information to the FBI concerning Walter Reed and Jerry Wayne Cox, Plaintiff was engaged in constitutionally protected activity.

41.

Plaintiff alleges that (2) Reed's and Jerry Wayne's actions caused Plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that protected activity. Plaintiff is informed and believes and thereon alleges that it is Walter Reed and Jerry Wayne Cox who orchestrated the arrest and lengthy incarceration (without bail), with the assistance and involvement of, among others, Sheriff Seal. The actions taken by Reed and Cox against Plaintiff would chill a person of "ordinary firmness" from continuing to engage in protected activity.

42.

Plaintiff further alleges that (3) Reed's adverse actions were substantially motivated by the Plaintiff's exercise of constitutionally protected conduct.  Plaintiff alleges that, first, Jerry Wayne's visit to Arkansas in 2012 and warning given to Plaintiff, together with Jerry Wayne's daughter's phone call immediately after Plaintiff's release, evidence, among other facts, that Plaintiff's speech was a motivating factor in Plaintiff's arrest (very shortly after arriving in Louisiana) and extended incarceration without bail.

43.

As a direct and proximate result of defendants' conduct as alleged above, Plaintiff has suffered and continues to suffer physical injuries and special and general damages.

44.

Plaintiff is entitled to attorney's fees pursuant to 42 U.S.C. § 1988.

45.

Plaintiff is further informed and believes and thereon alleges that the above-described acts of defendants depriving Plaintiff of his constitutionally protected rights, privileges and immunities were done with evil motive or intent, or with reckless or callous indifference to Plaintiff's rights. Accordingly, Plaintiff seeks an award of punitive damages against the individual defendants in an amount according to proof.

**No Qualified Immunity**

46.

At the time of the above arrest and use of force, the contours of the law concerning probable cause and reasonable uses of force were clearly established.

47.

Plaintiff further alleges that, at the time of defendants' actions, which conduct was either willful or done with deliberate indifference to Plaintiff's rights, such conduct was not objectively reasonable, and a reasonable official in those circumstances would understand that what he/she was doing violated the law.

## COUNT IV – VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. § 1983

### (Due Process – Conditions of Confinement Against Defendants Seal, Haley, And Miller)

48.

Plaintiff repeats, re-alleges, and incorporates by reference all of the preceding allegations of this Complaint.

49.

Plaintiff alleges that he possessed the right, guaranteed by the Fourteenth Amendment of the United States Constitution, to not be deprived of life, liberty, or property without due process of law.

50.

Plaintiff was, at all material times, a pretrial detainee.

51.

Plaintiff alleges that there is an explicit policy or restriction regarding conditions at the Washington Parish Jail, including the large number of inmates *vis-à-vis* the shortage of beds. This policy resulted in a number of inmates, including Plaintiff, sleeping on the floor. Further, Plaintiff alleges, there is an explicit policy to allow the walls and ceilings to remain caked with black mold and to do nothing about poor ventilation in, at least, Block D at the Washington Parish Jail.

52.

Further, Plaintiff alleges that there is either an explicit policy or restriction or *de facto* policy of failing to properly treat inmates, including inmates with a need for emergency care and care for chronic illnesses. Plaintiff alleges that the Washington Parish Jail's policies and procedures for evaluation, monitoring, and treatment of inmates' illnesses, including chronic illnesses, are either very poor or non-existent, as more fully set forth hereinabove. Plaintiff further alleges that Washington Parish Jail has either an explicit policy or *de facto* policy to ignore ARPs that involve complaints about the Jail's failure to treat.

*Plaintiff's Administrative Remedies have been exhausted*

53.

Plaintiff alleges that he submitted, at least, four (4) ARP Form Complaints concerning, among other things, his grievances regarding the lack of medical care. Plaintiff further alleges that, since there was never any response, the time for the State of Louisiana's response expired. Accordingly, Plaintiff alleges that he exhausted his administrative remedies within the meaning of 42 U.S.C. § 1997e(a).

54.

Plaintiff alleges that the Washington Parish Jail's above conditions stem from a pervasive pattern of serious deficiencies in providing for, at least, the following basic human needs: shelter, medical care, and reasonable safety. Plaintiff further alleges that the Washington Parish Jail has no legitimate penological or administrative goal in failing to render proper medical care, including for inmates with chronic diseases.

55.

As a direct and proximate result of these deficiencies, Plaintiff has suffered and continues to suffer physical injuries and special and general damages.

56.

Plaintiff is entitled to attorney's fees pursuant to 42 U.S.C. § 1988.

57.

Plaintiff is further informed and believes and thereon alleges that the above-described acts of defendants depriving Plaintiff of his constitutionally protected rights, privileges and immunities were done with evil motive or intent, or with reckless or callous indifference to Plaintiff's rights. Accordingly, Plaintiff seeks an award of punitive damages against the individual defendants in an amount according to proof.

**No Absolute Immunity For District Attorney Reed – Functionality Test**

58.

Plaintiff alleges that the actions of District Attorney Reed are not protected by the doctrine of absolute immunity.  Plaintiff is informed and believes and thereon alleges that Reed, among other things, gave advice to the Washington Parish Sheriff's Office, including without limitation Sheriff Seal, Deputy Chief Deputy Haley, and the arresting officers, on probable cause to arrest Plaintiff. Accordingly, Defendant Reed should be held personally liable.  Further, Plaintiff alleges that Reed was acting outside the bounds of his prosecutorial function when he imposed a "DA Hold."

**COUNT V – MONELL MUNICIPAL VIOLATONS UNDER 42 U.S.C. § 1983**

**(Against District Attorney Walter Reed, in his Official Capacity)**

59.

Plaintiff repeats, re-alleges, and incorporates by reference all of the preceding allegations of this Complaint.

60.

Plaintiff is informed and believes and thereon alleges that District Attorney Reed, in his official capacity, manifests a deliberate indifference to the violation of constitutional rights of the residents of Washington Parish, including Plaintiff herein.  This deliberate indifference is manifested by the failure to change, correct, revoke, or rescind policies, procedures, and customs, in light of prior knowledge by said defendant, and other policymakers, of indistinguishably similar incidents to residents of Washington Parish.  Plaintiff alleges that it is the policy, practice, and custom of defendant to ignore civil rights, including without limitation the right to be free from unlawful arrest and imprisonment.  In particular, Plaintiff alleges of instances where legal process was flaunted by Reed and his District Attorney's Office and where individuals were threatened with detention or were arrested as retribution.  On one occasion, Plaintiff is informed, a process server, Papillon Anderson, attempted service of a subpoena upon Reed on his final day of administration, January 9, 2015. When the process server attempted to leave an envelope with Mr. Reed, he was threatened by

Reed employees with detention by the St. Tammany Parish Sheriff's Office, unless he retrieved the envelope and left the building. On another occasion, on or about December 3, 2014, a process server (with a small child in tow) served an Assistant District Attorney, working underneath Reed, with a U.S. District Court (Eastern District of Louisiana) summons and complaint. In response, the process server was threatened and detained, again, by a St. Tammany Parish Deputy. For a short period, the process server was not allowed to exit the St. Tammany Parish Courthouse. In another publicized matter, an individual serving process (Mr. Doug Dendinger) served an individual with a U.S. Federal Court summons and complaint at the Franklinton Courthouse. This service occurred with two (2) Assistant District Attorneys, working underneath Reed, present. In response to this service, Mr. Dendinger was arrested and, then, prosecuted by Walter Reed. Plaintiff is informed that Mr. Reed signed the Bill Of Information against Mr. Dendinger. Because, however, the Assistant District Attorneys had provided witness statements, Mr. Reed, eventually, agreed to recuse his Office. The matter was referred to the Louisiana State Attorney General, who was provided with witness statements and cell phone video of the service of process, among other materials. The Attorney General, in short order, refused all charges (2 Felonies and 1 Misdemeanor) against Mr. Dendinger. Dendinger has filed a Federal Civil Rights suit, pursuant to 42 U.S.C. § 1983, in the matter entitled Douglas Dendinger v. City of Bogalusa (EDLA Case No. 13-5477 c/w 14-1837). Mr. Reed is a defendant in that matter. Among other allegations, Mr. Dendinger has alleged in his case that the Assistant District Attorneys working under Reed gave false witness statements; therefore, Dendinger alleges, they fabricated evidence and his unrest was unlawful. Further, Dendinger contends, the Assistant District Attorneys elected not to retrieve all-important Franklinton Courthouse Video, which, Dendinger contends, would have been exculpatory.

61.

As a direct and proximate result of the aforementioned acts, systematic deficiencies, policies, procedures, customs and practices of the above defendants, including Defendant Walter Reed, Plaintiff was wrongfully arrested and imprisoned, causing serious injuries to Plaintiff.

62.

Plaintiff alleges that Defendant Reed has policies, procedures, customs, and practices which violate the constitutional rights of residents and which manifest a deliberate indifference to the civil rights of members of the public by, among other things:

a.    Failing to adequately train Assistant District Attorneys and Staff in proper procedures consistent with the Fourth and Fourteenth Amendments of the United States Constitution;

b.    Condoning and participating in the fabrication of evidence and the withholding of exculpatory evidence by Assistant District Attorneys;

c.    Sanctioning, condoning, and approving the policy of arresting members of the public without probable cause or reasonable suspicion; and

d.    Sanctioning, condoning and approving a department-wide culture of prosecution at all costs (promoting the neighboring Parish of St. Tammany as "St. Slammany"), a euphemism for dishonesty by Assistant District Attorneys and the knowing violation of citizens' Civil Rights.

63.

The customs, policies and practices of the above defendants, and each of them, caused the constitutional injuries to Plaintiff herein.

**COUNT VI – MONELL MUNICIPAL VIOLATONS UNDER 42 U.S.C. § 1983**

**(Against Sheriff Randy Seal, in his Official Capacity as Sheriff for the Washington Parish Sheriff's Office)**

64.

Plaintiff repeats, re-alleges, and incorporates by reference all of the preceding allegations of this Complaint.

65.

Plaintiff is informed and believes and thereon alleges that Washington Parish Sheriff Seal manifests a deliberate indifference to the violation of constitutional rights of his residents, including Plaintiff herein.  This deliberate indifference is manifested by the failure to change, correct, revoke, or rescind policies, procedures, and customs, in light of prior knowledge by said defendants, and its policymakers, of indistinguishably similar incidents to residents of these defendants.  Plaintiff alleges that it is the policy, practice, and custom of defendants to ignore civil rights, including without limitation the right to be free from unlawful seizure and the right to be free from false imprisonment.

66.

As a direct and proximate result of the aforementioned acts, systematic deficiencies, policies, procedures, customs and practices of the above defendants, including Defendant Sheriff Seal, Plaintiff was wrongfully arrested, tased, and imprisoned under the unlawful conditions at the Washington Parish Jail set forth herein, causing serious, permanent injuries.

67.

Plaintiff alleges that Defendant Seal has policies, procedures, customs, and practices which violate the constitutional rights of residents and which manifest a deliberate indifference to the civil rights of members of the public by, among other things:

a.     Failing to adequately train officers and Commanders in the proper supervision, command and control of police officers, and failing to train in proper police procedures within the Fourth and Fourteenth Amendments of the United States Constitution;

b.     Failing to adequately train officers and Commanders in proper police tactics to prevent false arrests, fabrication of probable cause, and in making false affidavits;

c.     Failing to adequately train officers and Commanders in proper police practices and procedures for detentions and arrests;

d.     Failing to train police officers and Commanders to prevent false arrests and falsification of charges against persons who have not committed any crime or public offense;

e.     Covering up acts of misconduct, including, but not limited to, false arrest and/or dishonesty by its officers and thereby conveying to them its approval and/or lack of concern about police misconduct;

f.     Refusing to discipline adequately individual officers and employees found to have committed similar acts of abuse and misconduct; and

g.     Condoning and participating in the practice of making false arrests and falsely imprisoning arrestees.

h.     Failing to adequately train officers and Commanders in proper police tactics to avoid using excessive force;

i.     Failing to adequately train officers and Commanders in the proper police tactics and procedures in avoiding the use of force against persons who are compliant or who have complied with officers;

j.  Covering up acts of misconduct, including, but not limited to, the abuse of unnecessary force, false arrest and/or dishonesty by its officers and thereby conveying to them its approval and/or lack of concern about police misconduct;

k.  Covering up acts of misconduct, including, but not limited to, the abuse of unnecessary force, false arrest and/or dishonesty by its officers and thereby conveying to them its approval and/or lack of concern about police misconduct;

l.  Refusing to discipline adequately individual officers and employees found to have committed similar acts of abuse and misconduct;

m.  Refusing to investigate competently and impartially allegations of abuse and misconduct alleged to have been committed by officers, including the allegations made by Plaintiff in this case;

n.  Reprimanding, threatening, intimidating, demoting, firing and otherwise retaliating against officers who reported acts of abuse by other officers;

o.  Rewarding police officers who displayed aggressive and abusive behavior toward detainees, arrestees and members of the public;

p.  Condoning and participating in the practice of reducing or dismissing criminal charges against individuals in return for releasing defendants and employees of same from civil liability;

q.  Promoting and/or acquiescing in the policy of stopping, detaining, questioning and arresting members of the public without probable cause or reasonable suspicion; and

r.  Sanctioning, condoning and approving a department-wide "code of silence," a euphemism for perjury and dishonesty by peace officers.

68.

The customs, policies and practices of the above defendants, and each of them, caused the constitutional injuries to Plaintiff herein.

**COUNT VII – LOUISIANA STATE LAW CLAIM FOR BATTERY AND EXCESSIVE FORCE**

69.

Plaintiff repeats, re-alleges, and incorporates by reference all of the preceding allegations of this Complaint.

70.

The above named defendants are jointly, severally, and in solido liable to Plaintiff for the Louisiana State tort of battery, as more fully set forth above.

71.

As more fully set forth herein, Plaintiff alleges that defendants' actions were unreasonable under the circumstances.

72.

Among other things, given the lack of risk and danger that, in fact, was faced by the officers, and, in particular, the fact that Plaintiff was handcuffed and posed no risk and there was no chance of escape by Plaintiff, and the fact that there were no exigencies of the moment facing defendants, Plaintiff alleges that defendants, and each of them, are liable for battery and for excessive force.

73.

As a direct and proximate cause of the above, Plaintiff sustained serious personal injuries, for which he had to seek medical treatment and for which Plaintiff will require future medical treatment, all of which entitles Plaintiff to damages as more fully set forth below.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment in his favor and against defendants, jointly and severally, as follows:

1.      For a declaration that defendants' conduct deprived Plaintiff of his rights, privileges, and immunities secured by the Constitution of the United States;

2.      For an injunction, prohibiting in the future defendants' illegal acts and misconduct complained of herein;

3.      For compensatory general, special, and economic damages in an amount according to proof;

4.      For damages incurred to Plaintiff for his injuries, including without limitation physical and emotional pain and suffering, mental anguish, and loss of enjoyment of life in an amount of not less than Thirty Million Dollars ($30,000,000);

5.      For punitive damages;

6.      For attorneys' fees in accordance with any and all statutes and laws, including without limitation those attorneys' fees pursuant to 42 U.S.C. § 1988;

7.      For costs incurred herein; and

8.      For such other and further relief as this court may deem just and proper.


**RESPECTFULLY SUBMITTED BY:**


s/ Philip J. Kaplan_____
**Philip J. Kaplan (LA State Bar # 14415)**
**LAW OFFICES OF PHILIP J. KAPLAN**
3278 Wilshire Blvd., Suite 106
Los Angeles, CA 90010
Phone:  (213) 480-8981
Fax:     (213) 480-8941
Email:  philipkaplan@ca.rr.com

*Attorney for Plaintiff*
*Roger D. Magee*

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial in this action pursuant to Federal Rules of Civil

Procedure, Rule 38.

RESPECTFULLY SUBMITTED BY:

s/ Philip J. Kaplan_____
**Philip J. Kaplan (LA State Bar # 14415)**
**LAW OFFICES OF PHILIP J. KAPLAN**
3278 Wilshire Blvd., Suite 106
Los Angeles, CA 90010
Phone:  (213) 480-8981
Fax:      (213) 480-8941
Email:  philipkaplan@ca.rr.com

*Attorney for Plaintiff*
*Roger D. Magee*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on May 1, 2015, the foregoing *First Amended Complaint*

*For Damages, Declaratory Relief, And Injunctive Relief* was filed electronically with the Clerk

of Court using the CM/ECF System.

*s/ Philip J. Kaplan*_____
**Philip J. Kaplan (#14415)**

# EXHIBIT "A"

ore

Sign In

ow

50)

nglish

