**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

ROGER D. MAGEE                           CIVIL ACTION

VERSUS                                   NO. 14-1986

WALTER P. REED, ET AL.                   SECTION "B"(1)

## ORDER AND REASONS

Before the Court is Defendants' "Second Motion for Summary Judgment." Rec. Doc. 76. Plaintiff timely filed an opposition memorandum. Rec. Doc. 77. Defendants then requested (Rec. Doc. 81), and this Court granted (Rec. Doc. 83), leave to file a reply memorandum (Rec. Doc. 84). For the reasons discussed below,

**IT IS ORDERED** that the motion for summary judgment (Rec. Doc. 76) is **GRANTED IN PART**.

## I.    FACTUAL BACKGROUND AND PROCEDURAL HISTORY

This case arises out of the March 28, 2014 arrest of Roger D. Magee ("Plaintiff"). From sometime in 2010 through April or May of 2012, Plaintiff provided information to the Federal Bureau of Investigation ("FBI") about former Defendant Jerry Wayne Cox ("Cox"), a Pentecostal Minister in Franklinton, Louisiana, Cox's relationship with former Defendant Walter P. Reed ("Reed"), the former Washington Parish District Attorney for the 22nd Judicial District, and property damage insurance claims purportedly made by Cox and Reed. Rec. Doc. 23 at ¶¶ 1(a), 4(a). According to Plaintiff, Cox and Reed were involved in "the personal injury

'business.'" *Id.* at ¶ 4(b). Cox would purportedly "refer clients to Reed, while Reed, in turn, would bring in counsel . . . to file pleadings, etc." *Id.* The men then "shared in [the] settlement proceeds." *Id.* According to Plaintiff, his cooperation with the FBI concerned Cox and Reed because it could have led the FBI to various crimes, including the "underreporting of income and tax fraud . . . ." *Id.* at ¶ 4(c).

At some point between August 4 and 6, 2012, Cox and Reed attended a religious meeting in Arkansas, Plaintiff's home state. *Id.* at ¶ 5(a). While in Arkansas, Cox met with Plaintiff and "said to Plaintiff something to the effect of, 'You didn't scare us . . . much with the FBI; well, you scared us a little . . . but when I found out that Reed was ex-FBI, Reed said that he took care of it.'" *Id.* Cox further warned Plaintiff that, "[i]f and when you cross state lines [into Louisiana], Reed will handle you!" *Id.*

About two and a half months later, on October 25, 2012, an "Order for Body Attachment" was issued against Plaintiff for failing to pay child support payments to his ex-wife. *Id.* at ¶ 5(d). Even though the order was eventually recalled, Plaintiff alleges that the action was initiated by Cox and Reed. *Id.* at ¶¶ 5(e). To support this assertion, Plaintiff notes that his ex-wife never contacted him requesting payment, the order was issued only two months after Cox made his threats, and Defendant Randy Seal ("Defendant Seal"), the Sheriff for Washington Parish, in

2

partnership with Reed's office, participated in a "'roundup' of parents who were in arrears on their child support payments during 2013." *Id.* at ¶¶ 5(e)-(f) (emphasis deleted).

Plaintiff subsequently sought to visit his family in Louisiana, so he contacted the Office of Child Support Enforcement in Arkansas. *Id.* at ¶ 5(g). He was assured that he was protected by the court's recall order, but that he could take the recall order with him to Louisiana as a precaution. *Id.*

On Friday, March 28, 2014, Plaintiff traveled to his aunt's home in Franklinton, Louisiana for a relatively large family gathering. *Id.* at ¶ 6. Around 3:00 p.m., while Plaintiff was seated on the porch, holding his sixteen-month-old grandson, five police units converged on the premises. *Id.* at ¶¶ 6-7. The officers on the scene included Defendants Corbet Hunt, Darren Spears, Michelle Brumfield, Mitchem Nesmith, and Damen Mitchell ("Defendant Officers"). *Id.* at ¶ 11. These officers, clothed in body armor and many with their weapons drawn, approached the house. *Id.* at ¶ 7.

The lead officer "motioned with his finger to Plaintiff." *Id.* at ¶ 8. Plaintiff stood and "stated that, if this had to do with child support payments, he was 'in compliance' with the State of Arkansas and that he could show them court papers that relieved Plaintiff of his obligations due to his disabilities." *Id.* Plaintiff then proceeded toward open double doors leading to the dining room in order to retrieve the recall order. *Id.* at ¶ 9. In

response, Defendant Spears tased Plaintiff in the back; Plaintiff "crashed head first onto the concrete floor." *Id.* Three or four officers "[came] down on his back" and Plaintiff's left hand was handcuffed. *Id.* There is some dispute about whether or not Plaintiff's right hand was handcuffed before or after Defendant Spears tased Plaintiff a second time. *Id.; see also* Rec. Doc. 77 at 4 (citing Rec. Doc. 77-4 at 23).[1] At this point, however, it is undisputed that Defendant Spears did not warn Plaintiff before activating the taser for the second time. Rec. Doc. 23 at ¶ 9.

Eventually, Plaintiff stood and vomited. *Id.* at ¶ 12. Even though his family requested an ambulance, informing the officers that Plaintiff was diabetic, Plaintiff "was shoved into the rear of a patrol car where Plaintiff drifted in and out of consciousness as he was transported to the Washington Parish Jail in Franklinton, Louisiana." *Id.* at ¶¶ 12-13. Plaintiff was kept in a room in the Washington Parish Jail for approximately half an hour before he was booked. *Id.* at ¶ 14. During that time, one of the deputies purportedly "bragged, 'In case you ever want to come looking for me, I'm the one who tased you, you son-of-a-bitch.'" *Id.*

As a result of this incident, Plaintiff alleges that he was unconscious for some time, suffered a severe traumatic brain injury, injuries to his left foot, left knee, and shoulder, and

---

[1] Rec. Doc. 77-4 contains the deposition testimony of Defendant Spears. It will be cited according to the record document page number, not the page number of the deposition transcript.

subsequently experienced various symptoms, including profound headaches, disorientation, dizziness, and fatigue. *Id.* at ¶ 10. He claims that Reed, aware of the recall order, informed Defendant Seal that the sheriff's office had probable cause to arrest Plaintiff. *Id.* at ¶ 27(b). Further, Reed and Cox purportedly told Defendant Seal that Plaintiff's arrest should involve "a large deployment of officers and showing of force" and "the use of force against Plaintiff." *Id.* at ¶ 27(c).

Once incarcerated in Washington Parish Jail, Plaintiff claims that he was assigned to a block with black mold on the walls, little ventilation, and where inmates were forced to sleep on the floor. *Id.* at ¶ 17. Plaintiff alleges in his complaint that the jail is intentionally overcrowded in order to increase the money, based on the number of inmates, that is paid by the state to Defendant Seal. *Id.* at ¶ 18.

Further, despite Plaintiff's head injury and subsequent complaints, Plaintiff maintains that he was not given a CT scan for one and one-half months. *Id.* at ¶ 19. He was also purportedly denied insulin for three to four days at a time and medication for his blood pressure for approximately a week at a time. *Id.* Consequently, Plaintiff submitted four written "Administrative Remedy Procedure" ("ARP") complaints. *Id.* at 21. He never received a written response. *Id.* Accordingly, Plaintiff argues that Defendants Seal and Miller operate an understaffed facility that

fails to provide adequate medical treatment to inmates and has a policy ("either explicit or *de facto*") of ignoring ARP complaints. *Id.* at ¶ 20.

Pursuant to a plea agreement, Plaintiff eventually pled guilty to violations of Louisiana Revised Statute §§ 14:75 (failure to pay child support) and 14:108 (resisting an officer). *Id.* at ¶ 23. He was placed on probation for five years and released from jail on July 7, 2014 (101 days after his arrest). *Id.*

On May 1, 2015, Plaintiff filed an amended complaint, alleging (1) violations of his civil rights under 42 U.S.C. § 1983, including (a) false arrest and excessive force in violation of the Fourth and Fourteenth Amendments (*id.* at ¶¶ 25-31); (b) procedural due process violations and false imprisonment in violation of the Fourth, Fifth, and Fourteenth Amendments (*id.* at ¶¶ 32-37); (c) free speech retaliation in violation of the First Amendment (*id.* at ¶¶ 38-47); and (d) conditions of confinement that violated due process (*id.* at ¶¶ 48-58); (2) municipal violations under § 1983 and *Monell v. Department of Social Services of New York*, 436 U.S. 658 (1978), including those related to (a) former Defendant Reed's policies in the DA's office (*id.* at ¶¶ 59-63) and (b) Defendant Seal's policies in the Sheriff's Office (*id.* at ¶¶ 64-68); and (3) battery and excessive force in violation of Louisiana law (*id.* at ¶¶ 69-73). Plaintiff prayed for a declaratory judgment, an injunction, compensatory damages, damages incurred as a result of

6

physical and mental injuries (an amount not less than $30,000,000), punitive damages, attorneys' fees, and other costs. *Id.* at 33-34.

On June 15, 2015, Reed filed a motion to dismiss for failure to state a claim. Rec. Doc. 29. On August 19, 2015, this Court granted the motion, dismissing all claims against Reed, because (1) Plaintiff's false arrest and First Amendment retaliation claims were barred by *Heck v. Humphrey*, 512 U.S. 477 (1994), (2) Plaintiff's excessive force claim failed to show that the actions of the arresting officers were in some way caused by Reed and Plaintiff failed to satisfy his burden of showing that Reed was not entitled to qualified immunity, (3) Plaintiff's due process claim related to bond failed to show that Reed was "causally connected" to Plaintiff's bail problems, and (4) Plaintiff's *Monell* claim failed to show that any of the supposedly improperly-trained district attorneys participated in the claims brought against Plaintiff. Rec. Doc. 37. Plaintiff appealed the Order and Reasons. Rec. Doc. 40.

On July 22, 2015, Defendant Officers and Defendants Mike Haley, Miller, and Seal filed a motion for partial judgment on the pleadings or for partial summary judgment. Rec. Doc. 34. On August 31, 2015, the same Defendants filed a motion for summary judgment. Rec. Doc. 38. On October 19, 2015, this Court granted both motions. Rec. Doc. 49. Specifically, we found that the claims for false arrest, false imprisonment, and free speech retaliation previously

dismissed against Reed must also be dismissed against these Defendants pursuant to *Heck*. *Id.* at 9-15. Similarly, Plaintiff's *Monell* claims for false arrest and false imprisonment were found to be *Heck*-barred and were accordingly dismissed. *Id.* at 18-20. Nonetheless, we found that Plaintiff's excessive force claims, including his *Monell* claims based on excessive force, were not barred by *Heck*; therefore, the motion to dismiss/motion for summary judgment was denied to the extent it sought to dismiss the excessive force claims against these Defendants. *Id.* at 15-17, 20. The claims for battery and excessive force in violation of Louisiana law were dismissed as duplicative with Plaintiff's § 1983 excessive force claims. *Id.* at 17-18. Finally, Plaintiff's procedural due process claims for denial of bail were dismissed because there was no evidence to suggest that Defendants were in any way related to Plaintiff's denial of bail. *Id.* at 20-24.

On September 14, 2015, Cox filed a motion for judgment on the pleadings or, alternatively, a motion for summary judgment. Rec. Doc. 39. On October 28, 2015, this Court granted the motion and dismissed Plaintiff's claims against Cox with prejudice. Rec. Doc. 54. Specifically, we found that Plaintiff's claims for false arrest and imprisonment and for free speech retaliation were barred by *Heck*. *Id.* at 10-15. His claims for excessive force failed because they did not show how Cox was "causally connected" to the claim. *Id.* at 15-16. Finally, his claims for battery and excessive force

under Louisiana law were dismissed as duplicative. *Id.* at 16-17. Plaintiff appealed the Order and Reasons. Rec. Doc. 56.

On December 9, 2015, we granted Plaintiff's motion to stay pending the outcome of his appeals (Rec. Docs. 40, 56). Rec. Doc. 58. On January 22, 2016, the Fifth Circuit found that it lacked jurisdiction over the appeals, because we had not disposed of all claims and parties before the appeals were filed. Rec. Doc. 59 at 2. On March 17, 2016, the stay was lifted. Rec. Doc. 63. After trial was rescheduled for March 27, 2017, Defendant Officers and Defendants Haley, Miller, and Seal, filed the instant motion for summary judgment. Rec. Doc. 76.

## II.   THE PARTIES' CONTENTIONS

In their motion for summary judgment, Defendants contest (1) the claims related to excessive force, encompassing Plaintiff's claims of severe depression, and (2) the claims related to the conditions of Plaintiff's confinement, including any alleged policy to refuse adequate medical care. Rec. Doc. 76-1 at 4, 11.

### A. EXCESSIVE FORCE

The parties appear to agree that the first tasing is not actionable, based on this Court's earlier Order and Reasons finding certain actions barred by *Heck*. *See* Rec. Doc. 76-1 at 4 (citing Rec. Doc. 49); Rec. Doc. 77 at 12.

According to Defendants, the second tasing, which took place 13 seconds after the first, was in "probe mode," meaning that the

9

barbs fired from the taser were still in Plaintiff's body from the first tasing. Rec. Doc. 76-1 at 4 (citing Rec. Doc. 76-5 at 6).[2] It "was a manually controlled burst which [Defendant] Spears terminated after activating the taser for two (2) seconds." *Id.* (citing Rec. Doc. 76-4 at 4-6).[3] According to Defendant Spears, "the second tasing was necessary because [Plaintiff] was non-compliant, refusing to allow himself to be handcuffed." *Id.* (citing Rec. Doc. 76-4 at 3-4). Specifically, Defendants maintain that Plaintiff

> was noncompliant in that he would not make his right hand available to the arresting officers so that he could be fully handcuffed – the left hand had already been placed in a handcuff. [Plaintiff] struggled and refused to allow the placement of a handcuff on the right. Spears tased him again, for two (2) seconds, and his compliance was obtained.

*Id.* at 9.

However, Defendants suggest that during his deposition, Plaintiff testified that he was "tased more than twice, both before *and* after he was handcuffed." *Id.* at 5 (citing Rec. Doc. 76-6 at 3-23) (emphasis in original).[4] Specifically, Plaintiff said "they never got the handcuff on me. . . . They had one hand behind my back twisted. My other hand had went under me. Well, there's four

---

[2] Rec. Doc. 76-5 is the taser discharge report. The tasings at issue can be found on page 6, lines 161-62.
[3] Rec. Doc. 76-4 contains excerpts from Defendant Spears' deposition testimony. It will be cited according to the record document page number, rather than the page number listed on the deposition transcript.
[4] Rec. Doc. 76-6 contains excerpts from Plaintiff's deposition testimony. It will be cited according to the record document page number, rather than the page number listed on the deposition transcript.

men on top of me, you know, and they all fighting for my hand. I can't move because I'm being tased." Rec. Doc. 76-6 at 6. When Plaintiff subsequently said "and he tases me again," Defense counsel asked "And that's when they got the other arm out and handcuffed you?" *Id.* Plaintiff responded "Yes, sir." *Id.* This testimony benefits Defendants, who argue that if Plaintiff was tased before he was handcuffed, i.e. *while he was still allegedly resisting arrest*, then the second tasing would be barred by *Heck*. Rec. Doc. 76-1 at 5-6, 10.

After a recess during the deposition, however, Plaintiff "clarified" his testimony. *Id.* at 6. At that time, Plaintiff's counsel stated that "the witness wants to make something clear about some testimony that he's not sure was clear concerning the tasing and the handcuffing." Rec. Doc. 76-6 at 21. Plaintiff then testified "What I wanted to make clear was when I was on the floor, they had my hand . . . and they tased me . . . I'm guessing what would be the second time, I – they . . . bring my hand back around and they . . . handcuff me, and then the taser goes off again . . . . ." *Id.*

Plaintiff maintains that Defendants misrepresent his testimony. After Plaintiff responded "Yes, sir," to defense counsel's question "And that's when they got the other out and handcuffed you," defense counsel repeated the question: "Okay. So you were handcuffed after they tased you the second time?" Rec.

Doc. 77-3 at 36. Plaintiff responded, "Second or possibly the third time. The taser just kept going." *Id.* at 36-37. In other words, it appears that Plaintiff maintains that he consistently testified that he was unsure when the second tasing occurred. Plus, *before the recess* and subsequent "clarified testimony," the following exchange took place:

> "I think you clarified that you were tased a second time with your arm under your body, pinned under your body, and then after the second tasing, they took your arm out and handcuffed you; is that correct?"
>
> "Well, I'm not 100 percent sure on that."
>
> "Okay."
>
> "As far as when you say the tasing, I was kind of semi-dizzy, but I – There's a possibility that they, even after I was handcuffed, they tased me, and I – That's the reason I kept telling them . . . Because there was so many of them on me, I thought . . . the button was being pressed by not knowing, not knowingly. I didn't know the guy was standing ten feet, you know, out there with a taser gun just, just steady tasing one time after – behind the next, just tasing me."

Rec. Doc. 77-3 at 39-40.

In addition to the timing of the second tasing (and therefore the validity of any claims arising from it), Defendants also contest the severity of any injury allegedly resulting from the second tasing. Rec. Doc. 76-1 at 10. They suggest that, while the first, non-actionable tasing allegedly made Plaintiff fall and strike his head, Plaintiff "has not suggested a mechanism through which the second tasing could have led to a brain injury." *Id.*

Further, Defendants maintain that Plaintiff's expert, Dr. Kevin Greve, stated that "[n]othing related to [Plaintiff's] arrest or subsequent incarceration has caused new or worsening brain damage." *Id.* (quoting Rec. Doc. 76-7 at 2).[5]

Plaintiff responds that the second tasing "proximately caused 'severe and progressively worsening depression." Rec. Doc. 77 at 8. Dr. Greve apparently reviewed Defendants' memorandum in support of their motion and stated that

> Although it is accurate that my findings were not consistent with a traumatic brain injury, I did *not* conclude that [Plaintiff] suffered no injury affecting his mental state and cognitive abilities. Indeed, I opined: ' . . . [T]he <u>circumstances related to his arrest and incarceration have lead to a psychological reaction in the form of severe and progressively worsening depression</u>.

Rec. Doc. 77-13 at 3 (emphasis in original).[6] Dr. Greve further stated that "If we were to focus, solely, on the <u>second</u> instance of [Plaintiff] being tased, my opinion would remain that this second application of force (as well as other force applied after he was tased the first time) caused psychological injury (i.e., severe depression)." *Id.* at 4. Ultimately, Dr. Greve concluded that "the more damaging psychological blow inflicted against

---

[5] Rec. Doc. 76-7 contains Dr. Greve's October 14, 2016 expert report.
[6] Rec. Doc. 77-13 at 2-5 contains an affidavit from Dr. Greve. Notably, the underlined statement was included in Dr. Greve's original October 14, 2016 report. *See* Rec. Doc. 76-7 at 2.

[Plaintiff] may have been the second application of a taser, rather than the first." *Id.*[7]

In their reply, Defendants argue that Dr. Greve's declaration (Rec. Doc. 77-13 at 2-5) should not be considered because it is an expert report initially filed as an attachment to Plaintiff's opposition on January 24, 2017 and expert reports had to be exchanged by January 20, 2017. Rec. Doc. 84 at 6-7. To support their assertion that the declaration is an expert report, they noted that it "contains expert opinions, expert commentary, and elaborates extensively on Dr. Greve's original October 14, 2016, timely report." *Id.* at 7.

Further, even if the Court were willing to overlook the untimeliness of the declaration/report, Defendants argue that it suffers from issues under *Daubert v. Dow Pharmaceuticals, Incorporated*, 509 U.S. 579 (1993): (1) "it offers no scientific background for Greve's opinion that the two second tasing that indisputably took place thirteen seconds after the first, and was of shorter duration, would have . . . somehow lead to a [more] severe psychological reaction"; (2) Dr. Greve does not explain how Plaintiff's incarceration might have contributed to Plaintiff's depression or in what proportion; and (3) Dr. Greve does not consider other factors that might have impacted his opinion,

---

[7] These findings, specifically related to the second tasing, were not included in Dr. Greve's original October 14, 2016 report.

including Plaintiff's "pre-existing depression, his penchant for violence, his substance abuse problems, [and] a prior suicide attempt . . . ." Rec. Doc. 84 at 7-8. Because Dr. Greve "failed to make any attempt to eliminate some of the most obvious causes for [Plaintiff's] depression, i.e., make a differential diagnosis . . . . [h]is methodology is . . . unreliable [and t]he *Daubert* standard . . . precludes the use of the expert report and Declaration." *Id.*

Finally, Defendants argue that Dr. Greve's declaration is comparable to a "sham affidavit." Rec. Doc. 84 at 9. They explain that his original report does not distinguish between damages caused by the first tasing, second tasing, and/or Plaintiff's incarceration and his declaration is merely an attempt to attribute all damages to the second tasing (arguably the only avenue for recovery remaining for Plaintiff). *Id.* In Defendants' words, "[Plaintiff's] attorney specifically advised Greve that the first tasing is not [] actionable. . . . Greve then, naturally, focuses in his Declaration on the second tasing, concluding – voila! – that the second tasing was more significant than the first. . . ." *Id.*[8]

---

[8] Defendants also made other arguments related to Plaintiff's excessive force claims, including that they have a video refuting Plaintiff's claim that he was "shoved" into a patrol car and that they have EMT records to refute any claim that Plaintiff did not receive medical treatment on the day of his arrest. Rec. Doc. 76-1 at 10-11; *see also* Rec. Doc. 76-9 at 6. However, Plaintiff did not address these arguments in his opposition, so we will assume that there is no genuine issue of material fact and that he no longer maintains these claims. Further, the parties have competing experts and both parties cite to those experts throughout their memoranda. Naturally, the experts disagree as to the reasonableness of the second tasing. Given the conflicting opinions, the

**B. CONDITIONS OF CONFINEMENT**

In Plaintiff's § 1983 claims against Defendants Seal, Haley, and Miller, Defendants recognize four specific claims related to the conditions of Plaintiff's confinement:  (1) the existence of a policy to intentionally overcrowd Washington Parish Jail, forcing certain inmates, including Plaintiff, to sleep on the floor; (2) the existence of a policy to allow the jail walls to remain "caked" with black mold and to improperly ventilate the jail; (3) the existence of either an explicit or *de facto* policy against providing adequate medical care to inmates; and (4) failure to provide adequate administrative remedies to inmates. Rec. Doc. 76-1 at 11.

In his opposition, Plaintiff only addresses the last two claims. He specifically admits that he "is not making claims for mold-related injuries." Rec. Doc. 77 at 16 n.1. However, he simply does not address the arguments that Defendants raised regarding any alleged overcrowding. *See* Rec. Doc. 76-1 at 12. Therefore, we will assume that there is no genuine issue of material fact as to these claims, such that Defendants are entitled to judgment as a matter of law.

Further, it appears that Plaintiff is treating his claims of inadequate medical treatment and administrative remedies as a

---

reasonableness of the second tasing will not be determined on summary judgment. Instead, our analysis at the summary judgment stage will focus on whether or not Plaintiff's excessive force claim is *Heck*-barred.

single, related claim. He argues that "the focus of his claim is on the policies and conditions that affected both Magee and other detainees, *viz.*, the failure to administer and monitor medications, and the attendant systemic falsification of medical records and destruction of ARP complaint forms submitted not only by Magee but other detainess." Rec. Doc. 77 at 16 (emphasis added). In other words, the jail's failure to provide adequate administrative outlets led to, or was a part of, the jail's failure to provide adequate medical treatment. Consequently, below, we will address a single claim related to the conditions of Plaintiff's confinement, encompassing claims of inadequate medical care and administrative procedures.

### III. LAW AND ANALYSIS

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting FED. R. CIV. P. 56(c)). *See also TIG Ins. Co. v. Sedgwick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002). A genuine issue exists if the evidence would allow a reasonable jury to return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The movant must point to

17

"portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. If and when the movant carries this burden, the non-movant must then go beyond the pleadings and present other evidence to establish a genuine issue. *Matsushita Elec. Indus. Co., Ltd. V. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

However, "where the non-movant bears the burden of proof at trial, the movant may merely point to an absence of evidence, thus shifting to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial." *Lindsey v. Sears Roebuck & Co.*, 16 F.3d 616, 618 (5th Cir. 1994). Conclusory rebuttals of the pleadings are insufficient to avoid summary judgment. *Travelers Ins. Co. v. Liljeberg Enter., Inc.*, 7 F.3d 1203, 1207 (5th Cir. 1993).

### A. EXCESSIVE FORCE

#### 1. DID THE SECOND TASING OCCUR BEFORE OR AFTER PLAINTIFF WAS FULLY HANDCUFFED?

Defendants argue that Plaintiff's "clarified" deposition testimony should be dismissed in the same way that the Fifth Circuit dismisses "sham affidavits" that, without explanation, impeach sworn testimony in an attempt to defeat summary judgment. Rec. Doc. 76-1 at 7-8 (citing *S.W.S. Erectors, Inc. v. Infax, Inc.*,

Case 2:14-cv-01986-ILRL-JVM   Document 88   Filed 03/09/17   Page 19 of 45

72 F.3d 489, 495 (5th Cir. 1996) ("It is well settled that this court does not allow a party to defeat a motion for summary judgment using an affidavit that impeaches, without explanation, sworn testimony"); *Thurman v. Sears, Roebuck & Co.*, 952 F.2d 128, 137 n.23 (5th Cir. 1992); *Metro Cty. Title Inc. v. F.D.I.C.*, 13 F.3d 883, 887 n.16 (5th Cir. 1994); *Albertson v. T.J. Stevenson & Co.*, 749 F.2d 223, 228 (5th Cir. 1984).[9] Defendants argue that Plaintiff is maintaining that "he was tased for the second time *both before and after* being handcuffed." Rec. Doc. 84 at 3. Thus, according to Defendants, "[a]n after-the-fact effort to repair the damaging effects of a party's testimony by reversing course can be accepted by the courts only if a credible explanation for the 180 degree change in position is presented." *Id.* (citing *Thurman*, 952 F.2d at 136 n.23 ("The only explanation that Thurman offers for the contradictory statements contained in his Second Affidavit is that Sears' counsel outwitted him and made him utter words he did not intend—which words should not be construed against him as a conclusive admission. We find this explanation insufficient to

---

[9] Defendants argue that the "sham affidavit" approach accords with the "sham issue of fact" doctrine adopted in other circuits. Rec. Doc. 76-1 at 8-9 (citing *In re Fosamax Prods. Liabl. Litig.*, 707 F.3d 189, 193 (2d Cir. 2013) ("the District Court was entitled to disregard Dr. Epstein's new testimony relating to his knowledge based on the 'sham issue of fact' doctrine, which prohibits a party from defeating summary judgment simply by submitting an affidavit that contradicts the party's previous sworn testimony."); *Vinewood Capital, LLC v. Dar Al-Maal Al-Islami Trust*, 541 F. App'x 443, 447-48 (5th Cir. 2013) ("a party's uncorroborated self-serving testimony cannot prevent summary judgment, particularly if the overwhelming documentary evidence supports the opposite scenario") (citing *Vais Arms, Inc. v. Vais*, 383 F.3d 287, 294 (5th Cir. 2004))).

create genuine issues of material fact required to defeat summary judgment."); *Albertson*, 749 F.2d at 228 ("[t]he nonmovant cannot manufacture a disputed material fact where none exists. Thus, the nonmovant cannot defeat a motion for summary judgment by submitting an affidavit which directly contradicts, without explanation, his previous testimony.")).

Plaintiff counters that the "sham affidavit" argument is invalid in light of all of Plaintiff's deposition testimony, which demonstrates that he consistently stated that he was not sure when the second tasing took place and that it might have been after he was handcuffed. Rec. Doc. 77 at 7.[10]

Defendants respond that "[t]he overwhelming evidence shows that the second . . . tasing occurred before plaintiff was placed in handcuffs" and that "[t]he mere argued existence of a factual dispute will not defeat an otherwise properly supported motion." Rec. Doc. 84 at 2 (citing *Anderson*, 477 U.S. at 248 ("a party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine

---

[10] Plaintiff also makes a point to note that, even though the taser data was requested in April of 2015, Defendants did not turn over the data until September 9, 2016 (sixteen months after the initial request and approximately one month after Plaintiff's deposition). Rec. Doc. 77 at 7-8. Discovery issues may be handled through various motions to compel or for sanctions. *See* FED. R. CIV. P. 37. Defendants' delay in turning over this data, without more, is not an appropriate defense to Defendants' argument that Plaintiff's excessive force claims are barred.

issue for trial.'") (internal citations omitted)).[11] Defendants note that Plaintiff's deposition testimony that he was tased possibly three times and that the taser "just kept going" is inconsistent with the taser records, which show only two tasings. Rec. Doc. 84 at 2-3.

After considering the parties' arguments and reading the deposition testimony in full, it does not appear to the Court that Plaintiff "clarified" his testimony merely in an attempt to preserve a genuine issue of fact, but because he was sincerely uncertain about when the second tasing occurred. Defendants present testimony from officers stating that the second tasing occurred before Plaintiff's right hand was cuffed. Thus, there is conflicting testimony as to the timing of the second tasing. We cannot weigh the evidence or make credibility determinations on a motion for summary judgment. *Blank v. Bell*, 634 F. App'x 445, 447 (5th Cir.), *cert. denied,* 136 S. Ct. 2036 (2016) (citing *Deville v. Marcantel*, 567 F.3d 156, 163-64 (5th Cir. 2009)). Thus, it is

---

[11] Defendants also argue that, while judges may not make credibility determinations on a motion for summary judgment, "they are not precluded from ignoring common sense and human experience." Rec. Doc. 84 at 2-3 (citing *Hobgood v. Ill. Gaming Bd.*, 731 F.3d 635, 646 (7th Cir. 2013)). In *Hobgood*, the Seventh Circuit was considering Plaintiff's argument that Defendant's stated reasons for the plaintiff's termination were mere pretexts for unlawful retaliation. 731 F.3d at 645. After noting the stated reasons, the Seventh Circuit stated that "[w]e do not second guess an employer's business decision, but neither do we 'abandon good reason and common sense in assessing an employer's actions.'" *Id.* at 646. The court then cited a string of cases in which an employer's stated reason for a termination was without factual basis or completely unreasonable and therefore "evidence that [the] employer might be lying about its true motivation." *Id.* Neither *Hobgood*, nor the cases cited within it are helpful in the instant case.

for the jury to consider all of the evidence and determine if the second tasing occurred before or after Plaintiff was fully handcuffed. If the tasing occurred after he was handcuffed, Plaintiff's claims are certainly <u>not</u> barred by *Heck*.

### 2. EVEN IF THE SECOND TASING OCCURRED BEFORE PLAINTIFF WAS HANDCUFFED, ARE HIS EXCESSIVE FORCE CLAIMS NECESSARILY *HECK*-BARRED?

This Court's earlier Order specifically found that "Plaintiff's allegations that excessive force was used after he was handcuffed certainly do not invalidate his guilty plea to resisting arrest prior to being restrained, and therefore this claim is not *Heck*-barred." Rec. Doc. 49 at 16. We recognized that, at the time, Plaintiff was alleging only "that the officers came down on his back after he fell to the ground, handcuffed him, and [then] tased him once more. (Rec. Doc. 23 at 13)." *Id.* at 16 n.6.[12] Thus, we declined to "dismiss claims of excessive force after handcuffing in the absence of additional information . . . ." *Id.* at 16. Plaintiff's claims of excessive force used prior to being restrained, however, would tend to undermine his guilty plea to resisting arrest, so they were found to be barred by *Heck*. *Id.* at 16-17. Thus, <u>based on the information and allegations then before the Court</u>, we ruled that only Defendant's post-handcuffing conduct could be used to support Plaintiff's claims of excessive force.

---

[12] Plaintiff's memorandum in opposition to the motion specifically stated that the second tasing "was delivered to Plaintiff *after* Plaintiff had been handcuffed." Rec. Doc. 41 at 2-3.

Nonetheless, Plaintiff now alleges that he has a valid excessive force claim even if the second tasing occurred before a second handcuff was applied. *Id.* Plaintiff argues that there is no legal support for Defendants' position that "only alleged post-handcuffing excessive force is actionable" or for their assertion that Plaintiff "struggled" while he was on the ground. Rec. Doc. 77 at 12 (citing Rec. Doc. 76 at 5). Further, Plaintiff argues that his guilty plea could apply only to "his initial actions in getting up from the chair and turning toward the house, rather than coming toward one of the Deputies who had gestured to him." Rec. Doc. 77 at 14 (citing *Bramlett v. Buell*, No. 04-518, 2004 WL 2988486 (E.D. La. Dec. 9, 2004). "Accordingly, [Plaintiff's] civil claim regarding the use of force when he was tased a second time can co-exist with [his] criminal charge." *Id.* (citing *Bush v. Strain*, 513 F.3d 492 (5th Cir. 2008)).

At its core, our earlier ruling barred any claims that would undermine Plaintiff's guilty plea to resisting arrest. Plaintiff is now arguing that his guilty plea only applied to his non-compliant conduct before the second tasing and we will entertain those arguments now.

In *Bramlett*, officers responded to reports of a "scuffle" at a daiquiri shop. 2004 WL 2988486, at *1. Upon arriving at the scene, Derrick Bramlett, who was sitting in his vehicle, was identified as one of the individuals involved in the scuffle. *Id.*

The officers approached the vehicle, one standing in front of the vehicle and the other approaching from the driver's side. *Id.* Bramlett was asked to exit the vehicle, but he instead "started the engine and accelerated toward" the officer in front of him. *Id.* The officers fired several shots; Bramlett survived, but "was shot once in the head and twice in the back." *Id.* Bramlett was subsequently found guilty of aggravated battery against the officer standing in front of the vehicle and of three counts of vehicular negligent injury to pedestrians. *Id.* at *2. In Bramlett's subsequent § 1983 action, Bramlett alleged that the officers used excessive force when they shot at him. *Id.* The officers argued on summary judgment that Bramlett's excessive force claims were barred by *Heck*. *Id.* Bramlett denied that "a judgment in his favor on the excessive force issue would be inconsistent with his criminal convictions because the battery against [the officer] occurred *prior* to the use of excessive force." *Id.* After considering (1) "the specific elements that comprise[d] the conviction at issue" and (2) "the specific facts being alleged in the civil case," the court determined that Bramlett's aggravated battery conviction had no preclusive effect under *Heck* on the excessive force claim. *Id.* at *4. During Bramlett's trial, the officer testified that he had jumped out of the moving vehicle's path before shots were fired; "[t]hus, [the officer] did not shoot Bramlett in self-defense in order to protect himself from an

attempted murder or from an aggravated battery" and "a finding in this case that the officers stepped over the line in shooting Bramlett would do nothing to undermine the conviction for aggravated battery." *Id. See also Smithart v. Towery*, 79 F.3d 951 (9th Cir. 1996).

In *Bush*, the plaintiff threw a cup of ice water at a witness being interviewed by police. 513 F.3d at 496. An officer then attempted to arrest her for simple battery. *Id.* When her left hand was handcuffed, the plaintiff pulled her right arm away. *Id.* The officer testified that, while he was trying to cuff the plaintiff's right hand, she continued to resist and the two of them fell onto the rear window of a nearby vehicle. *Id.* The plaintiff testified that she stopped resisting, both hands were cuffed, and that the officer <u>then</u> forced her face into the rear window of a nearby vehicle. *Id.* The plaintiff filed a § 1983 action for excessive force; after she was subsequently convicted of resisting arrest, the officers moved for, and were granted, summary judgment under *Heck*. *Id.* On appeal, the Fifth Circuit recognized that even though *Heck* "applies to § 1983 excessive force claims, the determination of whether such claims are barred is analytical and fact-intensive, requiring us to focus on whether success on the excessive force claim requires negation of an element of the criminal offense or proof of a fact that is inherently inconsistent with one underlying the criminal conviction." *Id.* at 497. The Fifth Circuit continued,

> [A] § 1983 claim would not necessarily imply the invalidity of a resisting arrest conviction, and therefore would not be barred by *Heck*, if the factual basis for the conviction is temporally and conceptually distinct from the excessive force claim. Accordingly, a claim that excessive force occurred after the arrestee has ceased his or her resistance would not necessarily imply the invalidity of a conviction for the earlier resistance.

*Id.* at 498. In the plaintiff's criminal trial, the state court judge found that the officer "advised the defendant that she was under arrest and that as he was attempting to cuff her she struggled to get free from him to strike this other person . . . So, I find the defendant guilty of res[isting]." *Id.* at 499. According to the Fifth Circuit, "[t]he court made no findings regarding how long Bush's resistance lasted or at what point Bush was injured." *Id.* Ultimately, "[b]ecause Bush . . . produced evidence that the alleged excessive force occurred after she stopped resisting arrest, and the fact findings essential to her criminal conviction are not inherently at odds with this claim, a favorable verdict on her excessive force claims will not undermine her criminal conviction." *Id.* at 500.

In the instant case, Defendants argue "that the timing of the handcuffing is irrelevant because the Fifth Circuit recognizes a *Heck* bar if the incident involves a single interaction." Rec. Doc. 84 at 5 n.1 (citing *DeLeon v. City of Corpus Christi*, 488 F.3d 649, 656 (5th Cir. 2007)). More specifically, Defendants assert that "a claim of full innocence coupled with a guilty plea means

that the *entire* excessive force claim is *Heck*-barred if it involves
a single interaction, as it does here." *Id.* at 6 (citing *Daigre v.
City of Waveland, Miss.*, 549 F. App'x 283, 287 (5th Cir. 2013);
*Arnold v. Town of Slaughter*, 100 F. App'x 321 (5th Cir. 2004) (in
which the plaintiff asserted in the civil case that he had done
nothing wrong and was viciously attacked by the officer for no
reason, but the judge in the earlier criminal case made a specific
finding that the plaintiff resisted the officer by being hostile
and threatening; thus, the Fifth Circuit determined that a judgment
in the plaintiff's favor based upon the theory that the officer
used force against him for no reason whatsoever would be contrary
to this standing conviction) ; *DeLeon*, 488 F.3d at 656-57 (where
the "complaint maintains that [the civil plaintiff/criminal
defendant] did nothing wrong" and still thought he was innocent)).

However, Plaintiff <u>does not</u> maintain that he never resisted
or that he was "completely innocent." Rather, Plaintiff "*did* admit
in his deposition that one of the Deputies had gestured to him to
'come here', before [Plaintiff] went toward the house and before
he was tased the first time, and that [Plaintiff], instead, turned
toward the kitchen door." Rec. Doc. 77 at 3 (citing Rec. Doc. 77-
3 at 29-32). Significantly, the Fifth Circuit in *Bush* made the
following observations:

> The defendants also argue, albeit inartfully, that
> Bush's complaint does not allege that her claims of
> excessive force are separable from the events underlying

> her resisting arrest conviction. Specifically, the
> defendants point to the statement in Bush's complaint
> that "[a]t no time did the plaintiff resist her arrest."
> If we were to take this statement at face value, we might
> agree with the defendants. However, taking the statement
> in context, we conclude that Bush has adequately pleaded
> a claim for excessive force occurring after she was
> restrained.

513 F.3d at 499; *see also Daigre*, 549 F. App'x at 287 ("Unlike the

allegations in *Bush*, Daigre's broad claims of innocence relate to

the entire arrest encounter, and not merely a discrete part of

it."). Similarly, if we read particular sentences in Plaintiff's

complaint or memoranda out of context, it may appear that he was

claiming complete innocence. However, he explicitly admitted to

turning and walking away from the officers on the scene after being

told in a non-verbal way to "come here." Rec. Doc. 77 at 3. He

does not deny resisting in that way; rather, he denies resisting

after being tased the first time and alleges that the second tasing

was excessive. Indeed, contrary to Defendants' overbroad argument,

the court in *Bramlett* noted that "nothing in *Heck* and its progeny

support the proposition that a § 1983 excessive force claim is

barred merely because the same set of events give rise to both the

criminal conviction and the excessive force claim." 2004 WL

2988486, at *4.

Here, the record does not appear to contain the bill of

information to which Plaintiff pled guilty, the factual basis for

his plea, or findings of fact by a judge or jury. The Ninth Circuit

faced a similar situation in *Smith v. City of Hemet*, where plaintiff admitted to obstructing justice by repeatedly refusing to cooperate after being given verbal commands from officers; the officers <u>then</u> sought to take the plaintiff into custody and they used physical force to subdue him. 394 F.3d 689, 698 (9th Cir. 2005). The court explained:

> As in *Sanford v. Motts*, "nothing in the record informs us what the factual basis for [Plaintiff's] plea" was. 258 F.3d [1117,] 1119 [(9th Cir. 2001)]. There is no indication as to whether Smith's plea was based on his conduct that impeded the officers' investigation before they came onto the porch, or his subsequent resistance to their physical attempt to arrest him, or both. The record is clear that Smith pled guilty to one count of violation § 148(a)(1) when he willfully and unlawfully resisted, delayed, and obstructed the defendant officers in the discharge of, and attempt to discharge, their duty. Neither party in its briefs or at oral argument was able to identify the facts underlying the plea or to advise us regarding what transpired at the time Smith entered his plea. It is therefore entirely possible that, as Smith asserts, he pled guilty to a violation of § 148(a)(1) on the basis of his actions during the time the officers were conducting their lawful investigation. . . . Because we are unable to determine "the factual basis for [Smith's] plea," *id.*, his lawsuit does *not* necessarily imply the invalidity of his conviction and is therefore not barred by *Heck*.

*Id.*

In *Pertuz v. Normand*, the § 1983 plaintiff previously pled guilty to resisting arrest under Louisiana Revised Statute § 14:108; as to the basis for her guilty plea, the judge stated merely that "I find that there is a factual basis which exists for the defendant to plead guilty to the above mentioned claims." No.

13-0293, 2014 WL 1246839, at *1 (E.D. La. Mar. 25, 2014). The court ultimately determined that her excessive force claims were not *Heck*-barred, because the plaintiff's alleged sequence of events (some resistance followed by excessive force <u>after</u> the resistance ceased) was "consistent with her criminal conviction for resisting an officer and her section 1983 excessive use of force claim." *Id.* at *7.

Here, we do not know the factual basis for Plaintiff's guilty plea. Accordingly, it is possible that Plaintiff pled guilty to resisting arrest based solely on his initial reaction (standing and walking away from the officers). If this is true, then any judgment in his favor on his excessive force claims for police conduct following the first tasing would not tend to undermine Plaintiff's earlier guilty plea.[13] Accordingly, based on the information before us, Defendants are not entitled to judgment as a matter of law on Plaintiff's remaining excessive force claim.

---

[13] Notably, unlike the Texas statute for resisting arrest (Tex. Penal Code § 38.03), the Louisiana statute (LA. REV. STAT. ANN. § 14:108) does <u>not</u> require showing that the defendant prevented or obstructed a peace officer "by using force against the peace officer or another." *See also Stephens v. Scott*, 244 F. App'x 603, 604 (5th Cir. 2007) (affirming summary judgment finding that the plaintiff's excessive force claims were *Heck*-barred because the plaintiff's claims that "he did not use force against the officers in any way" would necessarily conflict with his guilty plea to the Texas statute). Here, Plaintiff's alleged series of events (initial resistance by walking away, not using force, followed by the first and second tasings) do <u>not</u> necessarily conflict with his guilty plea to the Louisiana statute.

**B. MEDICAL CARE**

The parties disagree as to the appropriate standard to be applied to Plaintiff's claims of inadequate medical care and administrative remedies. This is because Plaintiff's claims may arise under one of two theories:  a challenge of (1) a "condition of confinement" or (2) an "episodic act or omission." *Shepherd v. Dallas Cty.*, 591 F.3d 445, 452 (5th Cir. 2009) (quoting *Hare v. City of Corinth, Miss.*, 74 F.3d 633, 644-45 (5th Cir. 1996)). If Plaintiff properly states a claim challenging a condition of confinement, Defendants' intent may be inferred. *Id.* "More often, however, a plaintiff's claim, properly characterized, faults specific jail officials for their acts or omissions because the plaintiff cannot establish the existence of an officially sanctioned unlawful condition." *Id.* "[T]he focus of the claim is one individual's misconduct, the detainee is required to prove intent—specifically, that one or more jail officials 'acted or failed to act with deliberate indifference to the detainee's needs.'" *Id.* (quoting *Hare,* 74 F.3d at 648).

Plaintiff argues that he has alleged a policy or condition. Defendants argue, in a conclusory manner, that Plaintiff must demonstrate a sufficiently serious injury and deliberate indifference. Nonetheless, Plaintiff maintains that, even if we find the evidence insufficient to support a claim related to the conditions of confinement, he has adequately alleged deliberate

indifference. Accordingly, we will consider Plaintiff's claim under both standards.

### 1. CONDITIONS OF CONFINEMENT

Based on Plaintiff's testimony and the affidavit of former jail employee Tanner Rochester, Plaintiff alleges that the focus of his claim is the jail's official policy or pervasive condition. Rec. Doc. 77 at 16. However, it is important to note that the standard proposed by Plaintiff is rarely used and is available only when there "is a challenge to 'general conditions, practices, rules, or restrictions of pretrial confinement' . . . such as 'the number of bunks per cell, mail privileges, disciplinary segregation, etc.'" *Estate of Henson v. Wichita Cty., Tex.*, 795 F.3d 456, 463 (5th Cir. 2015) (quoting *Hare*, 74 F.3d at 644; *Shepherd*, 591 F.3d at 452).

Plaintiff claims that there is either an explicit or *de facto* policy to provide inadequate medical care. The affidavit of Tanner Rochester (which Defendant argues should be ignored because it is not based on personal knowledge of the jail at the time of Plaintiff's confinement) suggests that there was, at most, an <u>unwritten policy</u> to withhold medication as a form of punishment. Rec. Doc. 77-10 at ¶ 7. Thus, at most, the evidence presented by Plaintiff suggests that there was a *de facto* policy.

> [A] condition may reflect an unstated or *de facto* policy, as evidenced by a pattern of acts or omissions 'sufficiently extended or pervasive, or otherwise

> typical of extended or pervasive misconduct by [jail] officials, to prove an intended condition or practice.' Proving a pattern is a heavy burden, one that has rarely been met in our caselaw. Further, to constitute impermissible punishment, the condition must be one that is 'arbitrary or purposeless' or, put differently, 'not reasonably related to a legitimate goal.'

*Shepherd*, 591 F.3d at 452 (citing *Hare*, 74 F.3d at 645; *Bell v. Wolfish*, 441 U.S. 520, 539 (1979)).

Ultimately, to succeed on a conditions of confinement claim, Plaintiff must be able to show and, at the summary judgment stage, must be able to point to some evidence that:

> (1) "a rule or restriction or ... the existence of an identifiable intended condition or practice ... [or] that the jail official's acts or omissions were sufficiently extended or pervasive"; (2) which was not reasonably related to a legitimate governmental objective; and (3) which caused the violation of [the inmate's] constitutional rights.

*Estate of Henson*, 795 F.3d at 468 (citing *Duvall v. Dallas Cty., Tex.*, 631 F.3d 203, 207 (5th Cir. 2011) (quoting *Hare*, 74 F.3d at 645); *Edler v. Hockley Cty. Comm'rs Court*, 589 F. App'x 664, 668 (5th Cir. 2014)).

In *Shepherd*, the plaintiff "presented extensive independent evidence" to prove a *de facto* policy of failing to properly treat inmates; the Fifth Circuit determined that such a policy was "reasonably infer[red]" from a county-commissioned report, a United States Department of Justice report, jail officials' affidavits, and other documentary evidence indicating that the inmates received "grossly inadequate" treatment. 591 F.3d at 453.

33

In *Estate of Henson*, the plaintiffs alleged that a doctor was only required to be at the jail three times per week; nurses were not required to be at the jail 24-hous per day; the nurses were licensed vocational nurses ("LVNs"), not registered nurses; the LVNs were not supervised, as required by law; and "the lack of standing orders regarding pneumonia, Emphysema, and Chronic Obstructive Pulmonary Disorder (COPD), when combined with [the doctor's] absence, the LVNs lack of supervision, and [the doctor's] nurse intimidation, forced LVNs to illegally diagnose and treat Henson." 795 F.3d at 468-69. Even though the plaintiffs "identified a combination of staffing policies and practices," the Fifth Circuit determined that the staffing arrangement was reasonably related to providing medical attention to inmates and did not amount to punishment. *Id.* at 469 (citing *Bell*, 441 U.S. at 542). To prove that the medical system was constitutionally deficient, the plaintiffs needed to present evidence of "more than an isolated incident; [they] 'must demonstrate a pervasive pattern of serious deficiencies in providing for his basic human needs.'" *Id.* (citing *Edler*, 589 F. App's at 668 (quoting *Shepherd*, 591 F.3d at 454); *Duvall*, 631 F.3d at 208).

In the instant case, Plaintiff alleges that there is a *de facto* policy to refuse to administer and monitor medications, falsify medical records, and destroy ARP complaint forms submitted by inmates. Rec. Doc. 77 at 16; *see also* Rec. Doc. 77-10 at ¶¶ 8-

11. Looking at the evidence presented, there appear to be sporadic lapses or delays in the administration of medication to Plaintiff. Rec. Doc. 77 at 8-9. These failures do not appear "sufficiently extended or pervasive." Rather, "the complained-of harm [appears to be] a particular act or omission of one or more officials." *Smith v. Kaufman Cty. Sheriff's Office*, No. 10-703, 2011 WL 7547621, at *11 (N.D. Tex. Dec. 14, 2011), *report and recommendation adopted sub nom.*, 2012 WL 850777 (N.D. Tex. Mar. 14, 2012). In other words, particular jail personnel were "interposed between the detainee and the municipality, such that the detainee complains first of a particular act of, or omission by, the actor and then points derivatively to a policy, custom, or rule (or lack thereof) of the municipality that permitted or caused the act or omission." *Estate of Henson*, 795 F.3d at 463 (citing *Scott v. Moore*, 114 F.3d 51, 53 (5th Cir. 1997)). Further, to prove some policy or condition, Plaintiff relies solely on his own testimony and the affidavit of a former jail employee.[14] Finally, unlike the plaintiff in *Shepherd*, Plaintiff has not demonstrated that "serious injury and death were the inevitable results of the jail's" practices. *See Shepherd*, 591 F.3d at 454; *see also Duvall*, 631 F.3d at 208 (finding a *de facto* policy of exposing inmates to disease where there were around two hundred infections per month

---

[14] Notably, Defendants contest the validity of this affidavit. *See infra.*

and the "bizarrely high incidence" of the disease was known to the County); *Estate of Henson*, 795 F.3d at 469 (finding that there was no claim for conditions of confinement, even where the plaintiffs represented a deceased inmate and presented evidence of another death in the jail four months earlier); *see infra* for a more robust discussion of the seriousness of Plaintiff's claimed injuries. Consequently, we find that Plaintiff has not presented a claim for unconstitutional conditions of confinement.

### 2. EPISODIC ACT OR OMISSION

"A supervisor cannot be held liable under section 1983 on the basis of *respondeat superior*." *Southard v. Tex. Bd. of Criminal Justice*, 114 F.3d 539, 550 (5th Cir. 1997) (citing *Monell*, 436 U.S. at 694 n.58). "Rather, the misconduct of the subordinate must be affirmatively linked to the action or inaction of the supervisor." *Id.* at 550-51. For example, "a municipality can be liable for failure to train its employees when the municipality's failure shows 'a deliberate indifference to the rights of its inhabitants.'" *Farmer v. Brennan*, 511 U.S. 825, 840 (1994) (quoting *Canton v. Harris*, 489 U.S. 378, 389 (1989)). Thus, for a party to succeed on a failure-to-train claim, he or she must demonstrate that (1) the training procedures were inadequate; (2) the defendant was deliberately indifferent in adopting its training policy; and (3) the inadequate training policy directly caused the constitutional violation. *Sanders-Burns v. City of Plano*, 594 F.3d

366, 381 (5th Cir. 2010); *see also Saenz v. City of El Paso*, 637 F. App'x 828, 832 (5th Cir. 2016).

Ordinarily, to demonstrate deliberate indifference, "a plaintiff may allege that the municipality had '[n]otice of a pattern of similar violations,' which were 'fairly similar to what ultimately transpired.'" *Saenz*, 637 F. App'x at 832 (citing *Sanders-Burns*, 594 F.3d at 381). "Alternatively, a plaintiff may allege deliberate indifference if the specific injury suffered is a 'patently obvious' or 'highly predictable' result of inadequate training." *Id.* (quoting *Connick v. Thompson*, 563 U.S. 51, 64 (2011)). Notably, "[w]here an inmate can show no more than 'ordinary negligence,' such lapses by jail staff do not demonstrate 'a condition so threatening as to implicate constitutional standards.'" *Kitchen v. Dallas Cty., Tex.*, 759 F.3d 468, 483 (5th Cir. 2014), *overruling on other grounds recognized by Thompson v. Beasley*, 309 F.R.D. 236 (N.D. Miss. July 13, 2015) (quoting *Coleman v. Sweetin*, 745 F.3d 756, 764 (5th Cir. 2014)). As to claims of inadequate medical care, the plaintiff "must establish 'deliberate indifference to serious medical needs.'" *Wesson v. Oglesby*, 910 F.2d 278, 283 (5th Cir. 1990) (emphasis added) (quoting *Estelle v. Gamble*, 429 U.S. 97 (1976)).

First, Defendants argue that Plaintiff has failed to show that any violation was sufficiently serious. Rec. Doc. 76-1 at 15.

Second, Defendants maintain that Plaintiff cannot prove deliberate indifference. *Id.* at 17.

### a. DID PLAINTIFF SUFFER A SUFFICIENTLY SERIOUS INJURY?

The Fifth Circuit "has held that minor ailments do not constitute a serious medical need . . . ." *Pierce v. Scott*, 162 F.3d 1159 (5th Cir. 1998) (citations omitted); *see also Tasby v. Cain*, 86 F. App'x 745, 746 (5th Cir. 2004) (determining that the plaintiff's assertion that he suffered a rash was not a sufficiently "serious harm" under § 1983); *Wesson*, 910 F.2d at 284 (finding that "swollen wrists with some bleeding, do not constitute such a 'serious medical need' that any minor delay caused by the defendants in delivering [the plaintiff] to the care of medical personnel could be construed as 'deliberate indifference'"); *Patterson v. Orleans Par. Dist. Attorney's Office*, No. 06-7322, 2007 WL 5063238, at *17 (E.D. La. April 16, 2007), *report and recommendation adopted sub nom.*, 2008 WL 915447 (E.D. La. Mar. 31, 2008) (finding that "back or leg pain, 'nerves' and blood pressure" did not present serious medical needs that posed a substantial risk of harm during the plaintiff's incarceration); *Claudet v. Jones*, No. 10-87, 2010 WL 4365512, at *4 (E.D. La. Oct. 27, 2010) (finding that the plaintiff's back, neck, shoulder, and chest pain, as well as his high blood pressure, were not serious medical needs); *Lusk v. Dallas Cty. Sheriff's Dep't*, No. 00-662, 2002 WL 31757706, at *4 (N.D. Tex. Nov. 29, 2002) (finding that a herniated

disc and degenerative spinal disease were not sufficiently serious).[15]

Here, Defendants argue that, according to Plaintiff's own expert, Dr. Fadi Hendee, "[Plaintiff] *could* have sustained a serious injury but . . . *he did not*." Rec. Doc. 76-1 at 15. Specifically, Dr. Hendee made the following findings:

> In his Deposition, [Plaintiff] testifies that he received no insulin medication for approximately "five to seven days." In the case of [Plaintiff], a Type 2 Diabetic, the failure to receive insulin for such an extended period <u>will likely cause</u> symptoms and morbidity. These would include dehydration that, over time, <u>can cause</u> headaches, dizziness, increased urination, higher risk of infection and other negative symptoms. If untreated, such dehydration <u>can lead</u> to renal failure and hyperosmolar coma. I have been advised that [Plaintiff] did suffer from dizziness and headaches. In my opinion, the failure to receive medication and resulting dehydration <u>may have</u> likely caused such symptoms.

Rec. Doc. 76-10 at 2 (emphasis added). Based on these findings, Defendants argue that Plaintiff's symptoms "might" have been caused by a failure to receive medication. Rec. Doc. 76-1 at 15. Further, and more significantly, Defendants argue that dizziness

---

[15] Plaintiff argues that his "alleged injuries are not insignificant and rise above the necessary threshold. The 'physical injury' required by Section 1997 'must be more than de minimus, but need not be significant.'" Rec. Doc. 77 at 17. (quoting *Harper v. Showers*, 174 F.3d 716, 719 (5th Cir. 1999)). However, the court in *Harper* was considering a statutory provision, 42 U.S.C. § 1997e(e), part of the Prison Litigation Reform Act, which provides that "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison or other correctional facility for mental or emotional injury suffered while in custody <u>without a prior showing of physical injury</u>" (emphasis added). Thus, to claim a mental or emotional injury, the plaintiff must first show a physical injury that is more than de minimus. While Plaintiff argues that the second tasing caused depression, he <u>does not</u> link his supposedly inadequate medical care to any mental or emotional harm. Thus, the "de minimus" standard under § 1997e(e) is inapplicable.

and headaches do not amount to the type of serious injury that would give rise to an actionable constitutional claim. *Id.*

In response, Plaintiff argues that he suffered from headaches and a burning around the top of his head and that Dr. Hendee acknowledged that the failure to administer insulin could cause dehydration and other complications, "including the headaches that [Plaintiff] was experiencing." Rec. Doc. 77 at 11.

Based on the existing precedent, including *Pierce*, *Tasby*, *Wesson*, *Patterson*, *Claudet*, and *Lusk*, we agree with Defendants that general claims of dizziness and headaches are not "serious injuries" that could give rise to a claim under § 1983. Plus, it is not insignificant that Plaintiff's expert merely states that these injuries could have resulted from the alleged failure of jail personnel to administer Plaintiff's insulin medication.

### b. CAN PLAINTIFF PROVE DELIBERATE INDIFFERENCE?

Defendants maintain that Plaintiff cannot show deliberate indifference because "his basic medical needs were met," as evidenced by the medical records maintained during Plaintiff's incarceration. Rec. Doc. 76-1 at 17 (citing *Gobert v. Caldwell*, 463 F.3d 339, 347 n.24 (5th Cir. 2006) ("Medical records of sick calls, examinations, disagnoses, and medications may rebut an inmate's allegations of deliberate indifference") (quoting *Bannuelos v. McFarland*, 41 F.3d 232, 235 (5th Cir. 1995))). Specifically, records show that Plaintiff's medication was

administered and adjusted,[16] he was given two CT scans,[17] and Plaintiff repeatedly refused blood sugar tests. *Id.* at 17-18 (citing Rec. Doc. 76-15). Further, Defendant relies on affidavits from Defendants Seal and Haley to show that Plaintiff cannot prove that a violation resulted from a custom or policy. *Id.* at 18 (citing Rec. Docs. 76-16, 76-17).

Plaintiff responds that, even though medications for his diabetes and hypertension were given to jail personnel, along with instructions for their use, the jail failed to administer these medications to Plaintiff for the first five days of his imprisonment (March 28-April 2, 2014). Rec. Doc. 77 at 8-9 (citing Rec. Doc. 77-11 at 2). Further, the medication was not administered on seven days throughout April. *Id.* at 9 (citing Rec. Doc. 77-11 at 2). Plaintiff further claims that some of the jail records were falsified. *Id.; see also* Rec. doc. 77-3 at 90-94. Even though they purport to show that Plaintiff refused to have his blood sugar levels checked (*see* Rec. Doc. 77-11 at 3-7), Plaintiff testified that his levels were never checked during his incarceration and that "[t]hey did not have a way to check your sugar. Nobody down

---

[16] As to claims that Plaintiff did not receive blood pressure medication, Defendants cite to Plaintiff's medical records and argue that "his blood pressure concerns were treated adequately. In fact, his medication was adjusted as necessary." Rec. Doc. 76-1 at 16 (citing Rec. Docs. 76-11, 76-12).
[17] As to claims of a brain injury, Defendants again cite to Plaintiff's medical records, which show that he received a CT scan in April of 2014 (*see* Rec. Doc. 76-13) and another scan on June 19, 2014 (*see* Rec. Doc. 76-14). Rec. doc. 76-1 at 17. According to Defendants, Plaintiff "was given standard diagnostic treatment, and nothing of any significance was found." *Id.*

there ever got their sugar checked that I'm aware of" (Rec. Doc. 77-3 at 87). Further, former jail employee Tanner Rochester testified that "[o]verall medical care at the Jail was sporadic and poor, particularly with the administration and monitoring of medication." Rec. Doc. 77-10 at ¶ 6. He also stated that "it was an unwritten policy to withhold medicine from certain inmates as a form of punishment." *Id.* at ¶ 7. Further, "[a]part from some training re: first response, we received no medical training of any kind, including any training regarding chronic illnesses such as diabetes and hypertension." *Id.* at ¶ 5. According to Plaintiff, these "inadequate training policies caused the constitutional violation, *viz.*, the failure to administer insulin and the failure to monitor Plaintiff's blood sugar." Rec. Doc. 77 at 17.

As to the administrative remedies available to inmates, Mr. Rochester testified as follows:

> I am familiar with the system whereby inmates made complaints about conditions at the Jail, including complaints about inadequate medical care. Some of the complaints involved urgent medical matters. One of my duties was to collect the ARP's from the inmates. I would, then, deliver the ARP's to my Sergeant. The majority of the time (I would estimate approximately 9 out of 10 times), the ARP's at the Jail would be thrown away. I was disturbed by this practice and let the Sergeant know this. His response was, "That's how we do things here." I believe that Jim Miller was aware of this practice.

Rec. Doc. 77-10 at ¶¶ 8-11. Further, Plaintiff testified in his deposition that his ARP's were thrown away (*see* Rec. Doc. 77-3 at

42

111) and that "[t]he warden at one time told me . . . I've been
getting your APRs [sic]. I threw them away" (*id.* at 112).

Defendant argues that Rochester's affidavit should be
disregarded because it is not based on personal knowledge;
specifically, Mr. Rochester was employed by the Sheriff for an
eight-month period in 2013, but Plaintiff was only incarcerated in
2014. Rec. Doc. 84 at 10.

Pursuant to Federal Rule of Civil Procedure 56(c)(4), "[a]n
affidavit . . . used to support or oppose a motion must be made on
personal knowledge, set out facts that would be admissible in
evidence, and show that the affiant or declarant is competent to
testify on the matters stated." Mr. Rochester admits that he was
not employed by the jail at the time of Plaintiff's incarceration.
He therefore lacks personal knowledge of the acts or omissions
alleged by Plaintiff. Further, even if the affidavit were
admissible, Mr. Rochester's statement that he believed Jim Miller
was aware of certain alleged practices could not be considered.
*See McWhirter v. AAA Life Ins. Co.*, 622 F. App'x 364, 366 (5th
Cir. 2015) ("Lila emphasizes Karen's attestation in her affidavit
that, while she did not witness McWhirter's fall, she 'always
believed' it occurred while he was exiting the vehicle. This
statement is not valid summary-judgment evidence, as it is based
on belief rather than personal knowledge") (citing FED. R. CIV. P.

43

56(c)(4); *Bolen v. Dengel*, 340 F.3d 300, 313 (5th Cir.), *as amended* (Oct. 1, 2003)).

Nonetheless, without conclusively determining the value of Mr. Rochester's affidavit, Plaintiff's claims must still fail. In *Garcia v. Federal Bureau of Prisons*, the prisoner argued that "the prison medical staff was aware of his need for medications, which were prescribed but not provided promptly." 459 F. App'x 458, 458 (5th Cir. 2012). On appeal from the dismissal of his *Bivens* action and 42 U.S.C. § 1983 complaint, the Fifth Circuit noted that "[t]he fact of delay in itself is not sufficient to establish deliberate indifference" and "[t]he unexplained delays in dispensing medications constitute negligence at most." *Id.* at 459 (citing *Mendoza v. Lynaugh*, 989 F.2d 191, 195 (5th Cir. 1993); *Gobert*, 463 F.3d at 351-52 (stating that "a trier of fact might find negligence in the one week lapse in antibiotic treatment" but concluding that mere negligence could not support a finding of deliberate indifference); *Varnado v. Lynaugh*, 920 F.2d 320, 321 (5th Cir. 1991) (noting that "[u]nsuccessful medical treatment does not give rise to a § 1983 cause of action. Nor does '[m]ere negligence, neglect or medical malpractice.'") (citations omitted)).

Thus, at most, delays or lapses in the administration of medication to Plaintiff amount to negligence, not deliberate indifference. Accordingly, Plaintiff's claims for inadequate

medical care (or failure to adequately train jail personnel) must fail.

**IV.   <u>CONCLUSION</u>**

For the reasons outlined above,

**IT IS ORDERED** that Defendants' motion for summary judgment (Rec. Doc. 76) is **GRANTED IN PART.** Plaintiff's claim of excessive force survives. There is conflicting testimony as to the timing of the second tasing. If it occurred after Plaintiff was fully handcuffed, Plaintiff's excessive force claim is not barred by *Heck*. Further, even if it occurred before Plaintiff was fully handcuffed, Plaintiff's excessive force claim may not be barred by *Heck*, because a judgment in favor of Plaintiff on those claims would not necessarily undermine his guilty plea to resisting arrest. However, Plaintiff fails to (1) allege a proper claim for unconstitutional conditions of confinement or a sufficiently serious injury; or (2) submit adequate evidence of deliberate indifference. Accordingly, Plaintiff's claims of inadequate medical care are **DISMISSED WITH PREJUDICE.**

New Orleans, Louisiana, this 8th day of March, 2017.


_____
SENIOR UNITED STATES DISTRICT JUDGE