JENNIFER SHIRANE MAGEE on 08/16/2019

```
 1                UNITED STATES DISTRICT COURT

 2                EASTERN DISTRICT OF LOUISIANA

 3

 4    ROGER D. MAGEE                    CIVIL ACTION NO.

 5                                          14-01986

 6          VERSUS                      JUDGE IVAN L.R.

 7                                         LEMELLE

 8                                       SECTION "B"

 9    WALTER P. REED, ET AL.            MAGISTRATE (1):

10                                    JANET VAN MEERVELD

11

12

13

14         VIDEOTAPED DEPOSITION OF JENNIFER SHIRANE

15    MAGEE, 1073 HIGHWAY 48 E, TYLERTOWN, MISSISSIPPI

16    39667, taken at the LAW OFFICES OF SMITH & FAWER,

17    LLC, 201 ST. CHARLES AVENUE, SUITE 3702, NEW

18    ORLEANS, LOUISIANA 70170, in the above-entitled

19    cause on the 16th day of August, 2019.

20

21

22

23

24

25
```

```
 1          MR. KAPLAN:
 2               Is that a "yes"?
 3          THE WITNESS:
 4               Yes.
 5          MR. KAPLAN:
 6               Okay.
 7   BY MR. DUCROS:
 8          Q.   "Yes"?
 9               And just to be clear, Mr. Farmer
10   told you he went before the judge and asked the
11   judge about securing Mr. Magee's release.  And
12   did he say that the judge said, "It's not going
13   to happen"?
14          A.   Yes.
15          Q.   Okay.  All right.  Have you seen any
16   documents signed by Judge Badeaux that provide
17   that your husband cannot get out of jail unless
18   he pays $40,000?
19          MR. KAPLAN:
20               Objection.
21               You can answer the question.
22          THE WITNESS:
23               At the time, I was in Arkansas.  All
24          I know is they would not let him out, and
25          Mr. Farmer said they wasn't going to let
```

```
 1           him out.
 2   BY MR. DUCROS:
 3           Q.   I understand that, Ms. --
 4           A.   They even weren't trying for bail.
 5           Q.   I understand that, Mrs. Magee.  I'm
 6   just asking you if you've seen any documents
 7   signed by Judge Badeaux that provide that an
 8   attempt was made by Mr. Magee, or by Mr. Farmer
 9   on Mr. Magee's behalf, to secure his release and
10   that that was denied?
11           A.   Yes.  Anything that he filed, he
12   sent me.  I seen the documents.
13           Q.   Okay.  I don't think you answered my
14   question.  My question to you was:  Have you seen
15   any documents signed by the judge, Judge Badeaux,
16   denying a request by Mr. Farmer on your husband's
17   behalf to secure his release?
18                If you don't know what that is, just
19   let me know.  But I would like to know if you've
20   seen any such documents signed by the judge?
21           A.   I'm not sure.
22           Q.   Okay.  Now, you said Mr. Farmer sent
23   you every single document that he filed in the
24   court record; is that right?  A copy?
25           A.   Letters, yes.
```

```
 1          Q.    Letters or documents that he filed
 2    in the court record?
 3          A.    Mostly letters.
 4          Q.    Okay.  Did he send you copies of
 5    anything that he filed into the court's record,
 6    if you can recall?
 7          A.    One.  He sent me the one thing.
 8          Q.    Do you recall what that was?
 9          A.    Yes.  Asking for Roger's reduction
10    for his child support, showing that his children
11    was over age and that they had put six or seven
12    years on him that shouldn't have been there.
13          Q.    Okay.  And do you recall if that was
14    something he sent to you before Roger was
15    released or after he was released?
16          A.    I'm thinking before.
17          Q.    Okay.  Now, Mrs. Magee, do you have
18    copies of everything that Mr. Farmer sent to you?
19          A.    Yes, sir.
20          Q.    Do you maintain them in a file?
21          A.    I do.
22          Q.    Okay.  Is it in like a manila
23    folder?
24          A.    No, sir.  I just have it in a tote.
25          Q.    In a tote?
```

```
 1        A.    (Nods head affirmatively.)
 2        Q.    Did you bring that tote with you
 3   today?
 4        A.    I didn't.
 5        Q.    Okay.
 6        MR. DUCROS:
 7             Counsel, I'd like to have a copy of
 8        everything that Mrs. Magee suggests that
 9        she received from Mr. Farmer, please.
10        MR. KAPLAN:
11             Okay.
12   BY MR. DUCROS:
13        Q.    Okay.  So I'm going to ask you a
14   specific question about a document.  I think
15   you've already answered the question but just to
16   be clear.  Have you seen -- strike that.
17             Have you received a copy of any
18   filing made by Mr. Farmer on your husband's
19   behalf seeking to reduce the cash bond that was
20   set and required to be paid for him to be
21   released from jail?
22        MR. KAPLAN:
23             Objection.  Assumes facts.  Lacks
24        foundation.
25             But you can answer.
```

```
 1                  Do you know what an order for body
 2     attachment is?
 3          A.    Yes, pretty much.
 4          Q.    What is that; do you know?  What is
 5     your understanding of what that is?
 6          A.    Where they put a warrant out, and
 7     then they recall it.  That means they take it
 8     back.  It's no longer on you.
 9          Q.    So that would be an order recalling
10     an order for body attachment, right?
11          A.    Yes.
12          Q.    Okay.  So your understanding of what
13     an order of body attachment is, that's a warrant,
14     is your understanding, right?
15          A.    Right.
16          Q.    All right.  Have you seen a copy of
17     the order of body attachment?
18          A.    Yes.
19          Q.    Okay.  Do you have a copy of that?
20          A.    Yes.
21          Q.    Okay.
22          MR. DUCROS:
23                  Counsel, I think if Mrs. Magee has
24          it, I think that answers that question.
25          MR. KAPLAN:
```

```
 1                  She may be referring to the order to
 2          recall body attachment.
 3          MR. DUCROS:
 4                  Right.
 5          MR. KAPLAN:
 6                  Maybe --
 7          MR. DUCROS:
 8                  Well, whatever you got.
 9          MR. KAPLAN:
10                  Yeah.  Whatever we got, yeah.
11   BY MR. DUCROS:
12          Q.   All right.  So I want you to tell me
13   all the persons, all the people that were at
14   Roger's Aunt Ruby's house on the date that he was
15   arrested on March 28th, 2014, if you remember.
16          A.   It was me, Roger, Ruby, Sheree,
17   Uncle Robert, Debra, Paris, Brooklyn, Andrew,
18   Jace, and there were two other -- and Mike
19   Thomas, and two other kids, Hayden and Kaitlyn.
20          Q.   Okay.  Now, you said you met with a
21   police officer -- police officers in the jail
22   when Roger was being booked, and they told you
23   about the warrant they arrested him under and the
24   $19,000 of child support that he owed.
25                  Did you have any other meetings with
```

```
 1   disability, right?
 2         A.    Yes.
 3         Q.    And y'all have copies of documents
 4   relating to his approval for disability payments,
 5   correct?
 6         A.    Yes.
 7         Q.    And you have documents -- and do you
 8   also have documents relating to those disability
 9   payments that he's been receiving since he was
10   approved?
11         A.    Yes.
12         MR. DUCROS:
13               All right.  Counsel, that's the
14         subject of a discovery request.  I'd like
15         to have copies of everything that --
16         MR. KAPLAN:
17               Okay.
18         MR. DUCROS:
19               -- Mrs. Magee has in that regard.
20   BY MR. DUCROS:
21         Q.    Mrs. Magee, your husband, yesterday
22   said you have handled all the taxes since you
23   guys were married.  Is that a fair statement?
24         A.    Yes.
25         Q.    Okay.  Have you filed for taxes,
```

```
 1    filed federal and state taxes every year that you
 2    guys have been married?
 3          A.    Yes.
 4          Q.    Okay.  And do you have copies of all
 5    those tax returns?
 6          A.    I know I have from 2008 or '09.  I'm
 7    not sure if I do have the -- you know, from the
 8    other -- from 2003 or --
 9          Q.    Okay.  Do you have 2010 through
10    2015?
11          A.    Yes.
12          MR. DUCROS:
13                Okay.  Counsel, that's the subject
14          of another request.  I'd like to get
15          copies of 2010 to 2015.
16          MR. KAPLAN:
17                Yeah.  I don't know if they're
18          relevant, but I know that you're making
19          the request.  And we'll consider that
20          request, and let you know.
21    BY MR. DUCROS:
22          Q.    Okay.  And did you file those tax
23    returns jointly or were they --
24          A.    Yes.
25          Q.    -- individualized?  Okay.
```

JENNIFER SHIRANE MAGEE on 08/16/2019

143

```
 1                  Are you aware of any instance where
 2    Mr. -- where your husband was -- had to sit for a
 3    deposition like today besides his deposition
 4    yesterday and besides his deposition that
 5    Mr. Kaplan defended a couple years ago?
 6           A.    No.
 7           Q.    Okay.  Have you seen any copies of
 8    deposition transcripts involving your husband?
 9                  Have you ever seen a deposition
10    transcript before?
11           A.    Yes.
12           Q.    Okay.
13           A.    His.
14           Q.    His?
15           A.    Yeah.
16           Q.    And the one that you saw was the one
17    that he -- when he was deposed a couple years
18    ago?
19           A.    Right.
20           Q.    Have you ever seen any other
21    deposition transcripts of his?
22           A.    No.
23           Q.    "No"?
24                  I think you answered this question.
25    But you didn't have a written engagement
```

```
 1   agreement with John Allen, did you?  Or your
 2   husband didn't, did he?  Was there a written
 3   agreement with John Allen?
 4          A.   I went to his office and paid him a
 5   retainer.  I mean, I may have.  I don't actually
 6   remember.
 7          Q.   Okay.  Could you look to see if you
 8   have one of those?
 9          A.   Yes, I will.
10          MR. DUCROS:
11               And, Counsel, I would like a copy of
12          that.
13          MR. KAPLAN:
14               Sure.
15   BY MR. DUCROS:
16          Q.   And what about Marion Farmer?  I'll
17   be honest with you.  I don't remember if I asked
18   you this question.  Was there a written
19   engagement letter or contract of representation
20   with your husband and Marion Farmer?
21          A.   Yes.  We -- well, I mean, my aunt
22   paid him that day herself.  She's the one hired
23   him for me -- for him and me because I wasn't
24   there.
25          Q.   Okay.  But was there a contract, a
```

```
 1    written contract that you're aware of?
 2          A.    I'm not sure.
 3          Q.    Okay.
 4          A.    I'll have to check.
 5          Q.    Can you look for that, too, Mrs.
 6    Magee?
 7          A.    Yes.
 8          MR. DUCROS:
 9                Counsel, I'd like a copy of that,
10          too.
11          MR. KAPLAN:
12                Same thing, yeah.
13    BY MR. DUCROS:
14          Q.    And do you recall whether or not
15    Mr. Magee signed a contract with Mr. Kaplan, a
16    written contract; do you know?
17          A.    Yes.
18          Q.    Okay.
19          A.    I think, yes.
20          Q.    Do you have a copy of that?
21          A.    Somewhere.
22          Q.    Okay.
23          MR. DUCROS:
24                That's an outstanding request, too.
25          I know your objection.  We can deal with
```

```
 1          that.  But I'd like a copy of that as
 2          well.
 3   BY MR. DUCROS:
 4          Q.   Mrs. Magee, do you tithe to any
 5   churches currently?
 6          A.   Yes.
 7          Q.   Which church?
 8          A.   The one I attend now.
 9          Q.   Which is what?
10          A.   Dexter Pentecostal.
11          Q.   Is that where Roger goes, too?
12          A.   Yes.
13          Q.   Okay.  And did you guys tithe in
14   2014 before he was arrested?
15          A.   No.
16          Q.   Okay.  What about while he was
17   arrested?  Did you tithe to anybody while he was
18   in jail?
19          A.   I give.  Give an offering.
20          Q.   Yeah?  Did you guys tithe to Brother
21   Hickman's church when he was in jail in 2014?
22          A.   No.
23          Q.   Have you ever tithed to Brother
24   Hickman's church?
25          A.   Yes.
```