ROGER DALE MAGEE - VOLUME II on 10/03/2019

```
 1                  UNITED STATES DISTRICT COURT

 2                 EASTERN DISTRICT OF LOUISIANA

 3

 4
    ROGER D. MAGEE          *    CIVIL ACTION NO.:
 5                          *    14-01986
    VERSUS                  *
 6                          *    JUDGE(SECTION "B")
    WALTER P. REED,         *    IVAN L.R. LEMELLE
 7  ET AL.                  *
                            *    MAGISTRATE(1):
 8                          *    J. VAN MEERVELD
                            *
 9  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

10

11                  V O L U M E   II

12

13      CONTINUANCE OF DEPOSITION of ROGER DALE MAGEE,

14  taken on Thursday, October 3, 2019 in the Law

15  Offices of Knight Law Office, 1073 Cleveland Street,

16  Franklinton, Louisiana 70438 at 2:04 p.m.

17

18

19

20  REPORTED BY:

21      NANCY GAUTREAUX, RPR, CCR
        REGISTERED PROFESSIONAL REPORTER
22

23

24

25
```

1      A     I hadn't saw her till that day until now.

2      Q     Right.

3            Allison is one of the children that you've

4   disavowed or attempted to disavow, right?

5      A     Correct.

6      Q     All right.  Just to clear this up, I'm

7   going to mark as Exhibit 52 the notice of a

8   continuation of today's video deposition.

9            Mr. Magee, have you seen that before

10  today?

11     A     I mean, I don't say that I -- I'm not

12  going to say that I've seen this -- this paper, but

13  I'm seeing where, you know, Phil Kaplan, Mr. Leach

14  here...

15     (Exhibit 52 was marked for identification.)

16  BY MR. DUCROS:

17     Q     It's is a simple question, Mr. Magee.

18  Have you seen it before today -- yes or no, you

19  don't know?

20     A     No, I don't know.

21     Q     Thank you.

22           Next document I want to show you is a

23  letter dated June 13, 2019 I'm marking as Exhibit

24  53.  It's a letter from me to your attorneys

25  attaching a copy of our first set of requests for

```
 1  admissions, interrogatories and request for
 2  production of documents protounded -- propounded to
 3  you.
 4          You ever seen that document before,
 5  Mr. Magee?
 6      A    Not that I'm aware of.
 7      (Exhibit 53 was marked for identification.)
 8  BY MR. DUCROS:
 9      Q    Take a look at it first and tell me.
10      A    I'm looking at it and I still don't
11  remember.
12      Q    That's a letter.  Look at the attachment.
13      A    Okay.
14      MR. LEACH:
15          Take --
16      THE WITNESS:
17          Huh?
18      MR. LEACH:
19          Take some time, look at each page, read
20  the questions that are on the page.
21      MR. DUCROS:
22          You want him to skip the instructions?
23      MR. LEACH:
24          You could probably skip the instructions.
25      THE WITNESS:
```

1           Where do I look?  I mean...

2       MR. DUCROS:

3           There you go.

4       THE WITNESS:

5           Oh, okay.

6       A    I mean, I've -- I've got a copy of this at

7   my house I'm pretty sure.  So what's the question

8   again?

9   BY MR. DUCROS:

10      Q    Have you seen it before, Mr. Magee.

11      A    Yes, sir, I'm pretty sure that I've seen

12  it before.

13      Q    Do you remember reading it before today?

14      A    I remember skimming through it, but as far

15  as really sitting down looking at it, I mean, I

16  ain't studying it.

17      Q    You didn't study it, huh?

18      A    Studied it?

19      Q    You ain't studied it, huh?

20      A    I ain't studied it.

21      Q    Correct?

22      A    Correct.

23      Q    All right.  The next document I want to

24  show you is entitled Plaintiff's Responses to

25  Defendant Walter P. Reed in his former official

```
 1   capacity, First Set of Requests for Admissions,

 2   Interrogatories and Request for the Production of

 3   Documents.

 4            Would you look at that and tell me if

 5   you've seen that before today.

 6       A    (Views documents.)

 7       (Exhibit 54 was marked for identification.)

 8   MR. DUCROS:

 9            You need that (indicating)?  Anyone?

10   Bueller?  Fry?  Rick?

11   MR. SIMMONS:

12            What's that?

13   MR. DUCROS:

14            (Indicating.)

15       A    I saw it before --

16   BY MR. DUCROS:

17       Q    Yeah.

18       A    -- but I hadn't never really sat down and

19   studied it.

20       Q    Okay.

21       A    You know.

22       Q    You've seen it before, but you haven't

23   read it or studied it.

24       A    I've glanced through it, but...

25       Q    Okay.  Do you remember when you saw it
```

```
 1  before?

 2      A    It was way after I got out of the -- in

 3  2014, it was -- it would have been afterwards, I'm

 4  assuming.

 5      Q    I'll agree with you on that.

 6      A    Thank you.

 7      Q    Is there anything else on that document

 8  that may refresh your recollection of when you would

 9  have looked at it?

10      A    Yeah.  I mean, this Judge Ivan Lemelle,

11  this is when I -- probably after I went to court

12  in -- some years ago.

13      Q    All right.

14      MR. LEACH:

15          Roger, will you take a look at the last

16  page of that document.

17      THE WITNESS:

18          All right.  Okay.  It's got your name, so

19  this would have been in the last year, 2019.

20  BY MR. DUCROS:

21      Q    So you think you looked at it in 2019?

22      A    I doubt I looked at it.  I mean, I might

23  have skimmed over it.

24      Q    Uh-huh.

25      A    You know.
```

```
 1      Q    All right.

 2      A    I'm not big on reading stuff.

 3      Q    No?

 4      A    Like that, I mean, you know.

 5      Q    Too long, too many pages?

 6      A    Yeah, man.

 7      Q    How many pages is that document?

 8      A    At least 30.

 9      Q    Yeah?  You don't think you read the whole

10  thing?

11      A    I'm pretty sure I didn't.

12      Q    Okay.  The next document I want to show

13  you I'm marking as Exhibit 55 which is entitled

14  Plaintiff's First Supplemental and Amended Responses

15  to Defendant Walter P. Reed in his Former Official

16  Capacity, First Set of Requests for Admissions,

17  Interrogatories and Request for Production of

18  Documents.

19           You seen that one before, Roger?

20      A    Well, I'm pretty sure I've seen it and

21  glanced over it, but...

22      (Exhibit 55 was marked for identification.)

23  BY MR. DUCROS:

24      Q    Yeah?  You don't think you read the whole

25  thing?
```

```
 1     A     I don't think I read the whole thing.

 2     Q     Let's take a look at page three, why don't

 3  we.

 4     A     Okay.

 5     Q     Top of the page.

 6     A     Three?

 7     Q     Yeah.

 8           You need reading glasses or anything,

 9  you're good?

10     A     I'm good.

11     Q     It says "Please admit you hired attorney

12  John Allen to represent you in connection with your

13  March 28, 2014 arrest."  Do you see that?

14     A     Oh, yeah.

15     Q     You understand that question?

16     A     Yes, sir.

17     Q     The response provided is "Denied as

18  stated.  John Allen was retained at some point;

19  however, Plaintiff did not do so directly."  Do you

20  agree with that statement?

21     A     Denied as -- it's saying denied as stated

22  John Allen was retained -- who -- or what does it

23  mean, is that I was denied?

24     Q     Read the first section which is entitled

25  Request for Admission Number Three, and tell me what
```

 1  your answer is.

 2       A    Denied as stated, John Allen was

 3  retained --

 4       Q    Mr. Magee, please -- the request says

 5  "Please admit you hired attorney John Allen to

 6  represent you in connection with your March 28, 2014

 7  arrest."  Would you agree with that statement?

 8       A    Yes, sir.

 9       Q    All right.  Look at request for admission

10  number five:  Please admit your attorney John Allen

11  did not attend the 72-hour hearing held on march

12  31st, 2014 on your behalf.  Would you agree with

13  that statement?

14       A    I would.

15       Q    Turn to page six, please.

16       A    Okay.

17       Q    Now, Interrogatory No. 2 you say -- you

18  were asked, please identify all representatives of

19  the FBI you allegedly provided information to within

20  the seven -- I'm sorry -- several years you

21  referenced in paragraph 4A your first amended

22  complaint for damages.  There's more.

23            But I want to ask you, can you identify

24  all of the representatives from the FBI that you

25  spoke to?

 1  BY MR. DUCROS:

 2      Q    You're not answering my question,

 3  Mr. Magee, so I'm going to object to the

 4  responsiveness of that response.

 5           I want to know the sources of the

 6  information upon which you rely in making your

 7  allegation in paragraph 5E, page 10 of the amended

 8  complaint, Exhibit 3 to your deposition, Volume I.

 9      MR. LEACH:

10           And I'm going to repeat the earlier

11  objection I had, which is to note that that -- that

12  allegation is made upon information and belief.

13      MR. DUCROS:

14           Mister -- Mr. Leach --

15      MR. LEACH:

16           And the witness testified that he later

17  found that information.

18      MR. DUCROS:

19           All right.  Two things:  Number one,

20  Mr. Leach, your client says he barely even read this

21  thing, so I'm not going to rely on anything that we

22  discussed in our conference, okay?  That's number

23  one.  Number two, your client has now testified

24  under oath that he has a copy of a document which

25  we've been requesting now for over four months.  We

ROGER DALE MAGEE - VOLUME II on 10/03/2019

```
 1  want a copy of the document.
 2  BY MR. DUCROS:
 3      Q    Do you have any other documents that you
 4  have not shared with you counsel --
 5      A    A bunch of them.
 6      Q    -- that you haven't --
 7      A    A bunch of them.
 8      Q    -- shared with your counsel?
 9      A    Yes.
10      Q    Oh, that's great --
11      A    Yes.
12      Q    So where is that stuff at?
13      A    I don't where they at.  I just tell you I
14  got them.
15      Q    Do you know where they are?
16      A    No.
17      Q    You don't know where any of them are?
18      A    I know they in the attic.  I'm getting --
19  they're in my attic.
20      Q    They're in your attic?
21      A    In a box.
22      Q    In your attic, not --
23      A    In my attic.
24      Q    -- not your Aunt Hylon's attic?
25      A    No.  In my attic.
```

ROGER DALE MAGEE - VOLUME II on 10/03/2019

```
 1      Q     Okay.  Since -- since you met me, have you

 2   looked in the box in your attic?

 3      A     I have.

 4      Q     Okay.  Have you provided Mr. Leach with

 5   any of the documents in the --

 6      A     I hadn't.

 7      Q     Why not?

 8      A     Cause I ain't got to that box they in yet.

 9   It's a big attic, there's a lot of paperwork I got

10   up there.

11      Q     Mr. Magee, don't you think it would be

12   important to be cooperative with your attorneys when

13   they ask you for things that the attorneys on the

14   other side, meaning all the people in this room,

15   have been asking for?  Don't you think that by not

16   doing that you're delaying the process and wasting

17   time, money and resources of both the parties on the

18   other side that you're suing, the attorneys who are

19   representing them, and the court?

20      MR. LEACH:

21         Objection to form, and it's compound and

22   argumentative.

23      MR. DUCROS:

24         That's great.

25
```

1  BY MR. DUCROS:

2       Q    You can answer the question.

3       A    Lookie here.  I sat there and thought

4  about it that four months I sat in jail, and hell,

5  they wasn't in no hurry to see me sit there.  You

6  think I'm going to get in a hurry today for you,

7  cowboy?  No.

8       Q    That's all I needed to hear.  Thank you,

9  Mr. Magee.

10      A    But I have looked, but I ain't come across

11  them yet.

12      Q    Uh-huh.

13           Page eight of the document, the amended

14  complaint which is marked as Exhibit 3, please turn

15  to page eight.

16      A    Page eight?

17      Q    Yes.

18      A    Eight of eight or just eight of what?

19      Q    Page eight.

20      A    Page eight.  I don't see just page eight.

21      MR. LEACH:

22           Are you referring to the discovery

23  responses --

24      MR. DUCROS:

25           Yes, discovery responses.

ROGER DALE MAGEE - VOLUME II on 10/03/2019

```
 1       Q    You got that letter?

 2       A    Oh, I got that letter.

 3    MR. DUCROS:

 4            He's got that letter, Mr. Leach.  I'd like

 5    a copy of it.

 6       THE WITNESS:

 7            I could have showed it to you last week.

 8    My phone went out, but I took a picture of it and

 9    had it on my phone.  My phone went black, but I

10    still got a --

11    BY MR. DUCROS:

12       Q    Where is your phone right now?

13       A    It's in the garbage.

14       Q    Did you get a new phone?

15       A    I did.

16       Q    Do you have it with you?

17       A    I do, but it don't have the picture of

18    what I'm telling you.

19       Q    You didn't update your phone and save the

20    photographs?

21       A    No, it --

22       Q    Did you email that photograph to anybody?

23    Did you text message that photograph to anybody, to

24    your wife?

25       A    I think I did my wife.
```

```
1        Q    Okay.

2        MR. DUCROS:

3             Mr. Leach, I'd like a copy of the text

4   message with a copy of the photograph with -- of the

5   copy of the letter.

6        MR. LEACH:

7             Mr. Ducros, I will agree to the copy of

8   the letter if we can locate it.

9        MR. DUCROS:

10            I want a copy of the text message.  If I

11  need to file another request for production, I'd be

12  happy to send it to you.

13       THE WITNESS:

14            I'm not a hundred percent, now, on that.

15  BY MR. DUCROS:

16       Q    You said you were.  Now you're telling

17  me --

18       A    No, I didn't say I was.

19       MR. LEACH:

20            Mr. Ducros, hold up, hold up, hold up,

21  cause I'm going assert a privilege here.  Without

22  actually seeing what that text message was, there

23  may be a marital privilege between a husband and

24  wife.

25       MR. DUCROS:
```

```
 1       A    About that big (indicating).

 2       Q    With a carry handle?

 3       A    I've carried thousands of miles --

 4       Q    What about Debbie Cox, you got any

 5  communications with Debbie Cox?  I understand you

 6  went and saw Debbie Cox right after you got out of

 7  jail.

 8       A    She lied.

 9       Q    Oh, she lied.

10       A    She definitely lied.

11       Q    You didn't go see Debbie Cox's boyfriend

12  after you got out of jail?

13       A    No indeed.

14       Q    Okay.  Do you have any text messages with

15  Debbie Cox?

16       A    She sent me a picture.

17       Q    Yeah.

18       A    Of her and Kelvin, which I think my wife's

19  got it on her phone.  She sent it on the one that

20  crashed the other day.  I think my wife might have

21  retrieved it.  She may have got it on her's too, I'm

22  not sure, but she did send me a picture.  Every time

23  I've ever got out of jail, she would call me the day

24  after or the next day.  She says that I would go see

25  her husband, but she lied.
```

ROGER DALE MAGEE - VOLUME II on 10/03/2019

92

```
 1      Q    Okay.

 2      A    She lied about that.  But -- but she would

 3  call me.

 4      Q    Uh-huh.

 5      A    The first time she wanted to know if we

 6  gonna pursue it any further with -- this with the

 7  FBI and a lawsuit.

 8      Q    Right.

 9      A    Is what she was wanting to know.  And then

10  this just last time she told me and I had it -- she

11  text me and said that you only out because my daddy

12  told them to let you out.

13      Q    She did that in a text message?

14      A    She done it in a text message.

15      MR. DUCROS:

16           Mr. Leach, I'd like a copy of that

17  document.

18      THE WITNESS:

19           Ah, that's gone.

20      MR. DUCROS:

21           Well, didn't you say your wife retrieved

22  it?

23      THE WITNESS:

24           I said she might have retrieved that

25  picture.
```

```
 1      MR. DUCROS:

 2           Yeah.  Well, I'd like to see that, too.

 3      THE WITNESS:

 4           Might.

 5      MR. DUCROS:

 6           I'd like a copy of any communications

 7  between Mr. Magee and Ms. Debbie Cox.

 8      MR. LEACH:

 9           To the extent we can locate them, yeah.

10      MR. DUCROS:

11           Right.

12      THE WITNESS:

13           Yeah.

14      MR. LEACH:

15           Absolutely.

16           Say, line of questioning, we've been going

17  for about an hour --

18      MR. DUCROS:

19           I'm just about done.  I said I would be

20  about an hour.  I'm literally almost done.

21      MR. LEACH:

22           Okay.

23      MR. DUCROS:

24           I'm at the end, I promise.  Home stretch.

25      MR. LEACH:
```

ROGER DALE MAGEE - VOLUME II on 10/03/2019

```
 1  this lawsuit that you're aware of?

 2       A    Not that I'm aware of.

 3       Q    Your wife said that she had all the

 4  correspondence between you and the Arkansas --

 5  office of child support enforcement in Conway,

 6  Arkansas, and also representatives of the district

 7  attorney's office during that time.

 8            Are those documents located in the box

 9  that you've been telling me about today?

10       A    Yeah.

11       Q    Or are those documents located somewhere

12  else that your wife can put her finger on readily

13  easily?

14       A    No, they ain't to be easily.  Like I told

15  you, we've looked, and I ain't trying to put it off.

16  They're in an attic, and we've been through several

17  boxes, but we ain't come to the right box yet.

18       Q    And that would include copies of all

19  payments that you've made in connection with the

20  child support, documents that you have, anyway, that

21  relate to that, right, all in the same place, right?

22       A    That is correct.

23       Q    Same box.

24            Can you think of any other location where

25  you have documents relating to this lawsuit or the
```

```
 1  child support proceedings other than that box in the
 2  attic?  Is everything you have relating to that,
 3  it's all in that one box if it's not on your phone,
 4  right, or your wife's phone, right?
 5       A    That's right.
 6       Q    Now, what about your wife's phone, she's
 7  got the same phone she's had for a while?
 8       A    She's had this phone a long time, and I --
 9       Q    Is she pretty savvy with her phone?  Does
10  she know how to use it real well?
11       A    No, indeed not.
12       Q    She does not?
13       A    No.
14       Q    Okay.
15       A    She's -- we country hicks.
16       Q    All right.  Mr. Magee, in paragraph 15 of
17  your complaint -- amended complaint, you talk about
18  press releases by the Washington Parish Sheriff's
19  Office and the DA.  Do you have copies of those?
20       A    What it was?
21       Q    Paragraph 15, you said Plaintiff is
22  informed and believes that after his arrest either
23  the Washington Parish District Attorney Defendant
24  Reed and/or the Sheriff of Washington Parish,
25  Defendant Seal issued a press release concerning
```

1   Plaintiff.  In a local newspaper, The Daily News, an

2   article was published on April 1, 2014 entitled "Man

3   owing thousands in back child support arrested."  On

4   it's front page, the newspaper referred to a

5   deadbeat dad and showed Plaintiff's mugshot.  Press

6   release published by The Daily News stated the

7   following, blah-blah-blah-blah-blah.

8           Do you have copies of the press release

9   issued by the Washington Parish District Attorney's

10  Office that you're saying and Sheriff Seal in

11  addition to The Daily News?  Is that all going to be

12  located in that box?

13      A   Uh-huh.

14      Q   All right.  Yes or no?  That's a "yes"?

15      A   I do.

16      Q   You do.  Okay.

17          Do you have your tax returns?  I think we

18  already went over that with you wife.  2010 and

19  2014, she handles that, right?

20      A   I'm not sure what you saying -- asking.

21      Q   Tax returns from 2010 to 2014, your wife

22  handled that?

23      A   My wife handled them.

24      Q   And do y'all file -- y'all file jointly?

25      A   No.

ROGER DALE MAGEE - VOLUME II on 10/03/2019

100

```
 1      Q     Individually?

 2      A     Separately.

 3      Q     Separately.

 4      A     I don't file.  Since I've got on

 5   disability, I don't file.

 6      Q     Yeah, but you didn't get on disability

 7   until when?

 8      A     I think it's 20 -- the end of 2014.

 9      Q     So you filed in 2010, 2011, 2012, 2013?

10      A     Oh, yeah, I'm sure I did.

11      Q     Okay.  You have copies of those returns?

12      A     I don't know, man, I don't know.

13      Q     She would have -- she would know?

14      A     Nah, she -- I mean, I don't know if she

15   knows or not.

16      Q     You would defer to her before you would --

17   let me -- let me strike that question.

18            Let me ask this:  Would she know better

19   where those documents would be if you have them in

20   your house than you?

21      A     No.

22      Q     Why not?

23      A     Well, she just wouldn't.  We -- between

24   travels, I mean, I've lived in Missouri, I've lived

25   in Arkansas, I've moved -- I've lived in several
```

 1  places, and I don't know if we have them from one
 2  state to the next.
 3       Q    Who did your taxes in 2010 through 20 --
 4       A    I don't know.  I...
 5       Q    Did you do them yourselves or did you pay
 6  somebody?
 7       A    I always pay somebody.
 8       Q    Yeah.
 9            So you paid somebody in Arkansas?
10       A    I don't -- I don't -- I don't remember.  I
11  mean, I do not remember.
12       Q    But you were living in Arkansas from 2008
13  to 20 -- when?  Recently, right?
14       A    Eight years, eight...
15       Q    2008 to 2016?
16       A    A couple -- three years ago, 20 --
17       Q    Right.
18            So did you have the same person do your
19  taxes in Arkansas or did you flit around?
20       A    No, I think -- I mean, I don't know.  God,
21  I don't know.  My mind can't wrap around that one.
22  I mean, Jen would know better that than me.
23       Q    All right.  So if she said she had copies
24  of them and could find them --
25       A    Yeah.

 1     Q     -- you'd defer to her, right?

 2     A     Right, right.

 3     Q     All right.  You're on Medicaid?

 4     A     I'm on Medicaid and Medicare.

 5     Q     How old are you?

 6     A     Fifty-five.

 7     Q     You're on Medicare right now?

 8     A     I'm on both.

 9     Q     Medicare cause of disability?

10     A     Yes, sir.

11     Q     All right.  We talked about a couple of

12  lawsuits that you had been involved in before, and I

13  asked your attorney for copies of the transcripts of

14  depositions from those cases.

15          Do you have copies of any of your

16  depositions in any of those cases?

17     A     No.

18     Q     Like the barbecue case?

19     A     No.  Cause it never went nowhere.

20     Q     What about the roller rink case where you

21  fell down at the roller rink and you sued them for

22  falling down at the roller rink?

23     A     First of all, I didn't fall down at the

24  roller rink.  I hit a hole and my feet come out from

25  under me, and I won the case.

```
 1              All right.  Counsel, I think based on the

 2   deposition testimony today, you owe me another

 3   supplement, unless you want to do a 37.1.  It's up

 4   to you.

 5        MR. LEACH:

 6              I mean, whatever we can locate, we can try

 7   and locate documents.  He testified he hasn't been

 8   able to locate them yet.  We'll continue.

 9        MR. DUCROS:

10              Right.  I would like a copy of the

11   contents of the box that's in the attic, obviously

12   subject to anything that you --

13        MR. LEACH:

14              Subject to privilege review.

15        MR. DUCROS:

16              And I would -- I would appreciate if we

17   could get that within the next month.  We've been

18   dealing with this now for five months.

19        MR. LEACH:

20              As soon as it's found.

21        MR. DUCROS:

22              I understand that, but we're talking about

23   now we know where the stuff is, he just has to go

24   find it, right?  We've been waiting on it for five

25   months.  I don't want to delay this anymore.
```

```
 1      MR. LEACH:

 2          Mr. Ducros, and I think he's testified,

 3  he's looked, he just hasn't finished completely --

 4  he can't find it at the moment.  He hasn't been able

 5  to locate it.

 6      MR. DUCROS:

 7          Because he hasn't looked at everything

 8  yet.

 9      MR. LEACH:

10          All right.

11      MR. DUCROS:

12          Let's see, a couple more things.

13  BY MR. DUCROS:

14      Q    What did you do to prepare for today,

15  Mr. Roger?

16      A    Nothing.  Just prayed.

17      Q    You just prayed.

18          Did you pray with your preacher again?

19      A    Which one?

20      Q    Which preachers do you have?

21      A    I just got one.

22      Q    Let me ask you this:  Do you -- would you

23  agree that your wife has a better memory than you?

24      A    Most definitely.

25      Q    All right.  You were present for her
```